10 CV 4312

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

ADDIE VANCIL, Derivatively on Behalf of
ISTAR FINANCIAL INC.,

             Plaintiff,

vs.

JAY SUGARMAN, ROBERT W. HOLMAN,
JR., ROBIN JOSEPHS, GEORGE R. PUSKAR,
JOHN G. MCDONALD, JEFFREY A. WEBER ,
GLENN R. AUGUST , DALE ANNE REISS ,
CATHERINE RICE, NICHOLAS A.
RADESCA, and TIMOTHY J. O'CONNOR,

             Defendants,

  -and-

ISTAR FINANCIAL INC., a Maryland
corporation,

             Nominal Defendant.

-------------------------------------------------------------- X

:  Civil Action No.

:  VERIFIED SHAREHOLDER DERIVATIVE
:  COMPLAINT FOR BREACH OF
:  FIDUCIARY DUTY, WASTE OF
:  CORPORATE ASSETS, AND UNJUST
:  ENRICHMENT

DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.       This is a shareholder derivative action brought by a shareholder of iStar Financial, Inc. ("iStar" or the "Company"), on behalf of the Company against certain of its officers and directors. This action seeks to remedy defendants' violations of state law including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, which have caused substantial monetary losses to iStar and other damages, such as to its reputation and goodwill. Plaintiff has made a litigation demand upon iStar's board of directors (the "Board"). The Board has wrongfully ignored and refused plaintiff's demand.

2.       Defendant Jay Sugarman ("Sugarman") founded iStar, a real estate investment trust focused on commercial real estate and commercial mortgage financing, in 1993. He installed himself as the Company's Chief Executive Officer ("CEO"), Chairman of the Board, and public face. A graduate of Princeton University and the Harvard Business School, Sugarman presents himself as smarter than the market. His carefully crafted biography reminds investors that he received the Harvard Business School's academic prizes for both finance and marketing. Sugarman markets his finance ventures largely on the basis of self-promotion. iStar is no exception. According to Sugarman, who quotes himself on iStar's website, "One of our competitive strengths is a *proven ability to see out ahead of markets and position our company to take advantage* of opportunities that are less apparent to the broader investment community."

3.       In 2007, the overheated United States real estate and credit markets began their precipitous and inexorable collapse. For instance, Countrywide Financial Corp. ("Countrywide"), one of the Nation's largest mortgage originators, reported in the second quarter of 2007 that nearly 25% of its nonprime loans were delinquent. Countrywide explained in its July 24, 2007, press release that "delinquencies and defaults continued to rise across all mortgage product categories." On March 13, 2007, GMAC LLC's mortgage unit, Residential Capital LLC, announced huge losses of $631 million for the fourth quarter of 2006. By the third quarter of 2007, several of world's

- 1 -

largest banks had announced massive, multi-billion dollar write-downs of mortgage related assets, reflecting the free fall in the real estate markets. Citigroup announced $11 billion, UBS Financial Services recorded $10 billion, and Merrill Lynch reported $8 billion in write-downs.

4.      Heedless of the risks, Sugarman and his management team caused iStar to acquire the $6.27 billion commercial real estate loan portfolio and commercial real estate lending business of Fremont Investment & Loan ("Fremont") from Fremont General Corporation. Fremont's loan portfolio was riddled with billions of dollars worth of poorly collateralized construction loans and funding commitments to speculative condominium developments in some of the Nation's most overheated real estate markets, including Atlanta, Phoenix, and Southern California. On March 2, 2007, the Federal Deposit Insurance Corporation (the "FDIC") entered into a cease and desist agreement with Fremont General, finding that it had operated "with inadequate underwriting criteria"; "without an accurate rigorous and properly documented methodology concerning its allowance for loan and lease losses"; "with a large volume of poor quality loans"; "[with] unsatisfactory lending practices"; and had made "mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms[.]" But Sugarman thought he knew better and could outsmart the markets. He was disastrously wrong. As speculators vanished from the market and demand collapsed, condominium and commercial real estate developers stopped paying and later defaulted on their loans *en masse*. Confidence in the value of the collateral securing mortgage-backed securities collapsed, cutting off the spigot of easy credit. Housing-related businesses faltered, as well, resulting in deep ratings cuts and jeopardizing income streams from iStar's massive investments in their debt securities. Rather than shield the Company from the worst excesses of the overheated real estate markets, as they told shareholders they had done, Sugarman's management team had exposed iStar to the full force of the devastating market correction.

5.      But Sugarman would not forthrightly disclose the disastrous consequences of the Fremont acquisition or the material deterioration of credit quality in iStar's portfolio of loans and debt securities. Having sold himself and his management team as better informed and smarter than their competitors, Sugarman could not bring himself to tell the truth. Sugarman and his team, with

the knowing acquiescence of the Board, repeatedly published misleading statements about the iStar management team's purportedly unique ability to steer iStar clear of the riskiest real estate loans and to maintain the credit quality of iStar's loan portfolio.

6.     Fully aware of the mounting crisis the Fremont assets created for iStar's balance sheet and the impact of the broader market meltdown on the credit quality of iStar's loan portfolio, rather than disclose the true state of iStar's finances and future challenges, Sugarman and his team set out to buttress the Company's cash reserves through debt and share offering at prices inflated by false information. Although defendants announced in May 2007 that the offering would replace a bridge facility used to fund the Fremont acquisition, they soon learned that iStar would need the cash just to survive the downturn and to fund the enormous reserves required under Generally Accepted Accounting Principals ("GAAP") to address the collapsing credit quality in its loan portfolio. Despite numerous opportunities to correct the record in the several amendments of the various registration statements and proxies that were published from May 2007 until the day of the December 12, 2007 offering (the "Secondary Offering"), Sugarman and his team repeatedly misled shareholders, withholding the material decline in the Company's debt security values, the drastic increase in loan losses, the substantial drop in the credit quality of the Company's loan portfolio, and the fact that iStar was disastrously under-reserved to cope with probable loan losses. The failure to build proper loan loss reserves permitted Sugarman and his team to substantially overstate iStar's earnings through the Secondary Offering.

7.     Sugarman and his team affirmatively misled investors in order to ensure the success of the Secondary Offering, in hopes that the cash would permit them to ride out the market downturn without having to disclose the truth about iStar's disastrous financial condition. At the Company's December 6, 2007, Investors Day Conference held just six days before the Secondary Offering, Sugarman and his Chief Financial Officer ("CFO"), Catherine Rice ("Rice"), and Chief Operating Officer, Timothy O'Connor ("O'Connor"), affirmatively misrepresented iStar's "balance sheet strength," the credit quality of its loan portfolio, and its financial performance, while discounting the

- 3 -

effect of the housing market downturn on the Company. Defendants falsely assured investors and shareholders that, *inter alia*:

- iStar's debt was "extremely well protected,"
- iStar's loan portfolio had "a lot of room for things to go wrong and for us to still be okay," and
- the portfolio was "performing pretty much as expected ... no surprises."

8.     On February 28, 2008, just two months after the Secondary Offering, defendants disclosed a $134.9 million write-down of the Company's corporate loan and debt portfolio and a $113 million increase to the Company's loan loss provision.     The write-down and loan loss contributed to a $78.7 million loss. This disclosure revealed that the Company's portfolio was not performing as expected, the credit quality of the debt the Company held was drastically overstated, and iStar's loan loss reserves had been materially understated given the deteriorating condition of its loan portfolio. These facts were known to defendants well before the Secondary Offering was completed on December 14, 2007. Upon their disclosure, iStar's stock price fell from $27 per shares to less than $17 per share – a $1.3 billion loss in market capitalization.

9.     One day after these announcements, defendant Nicholas A. Radesca ("Radesca"), then iStar's Chief Administrative Officer, "resigned" from the Company. His resignation was followed four months later by the "retirement" of iStar's then-CFO, defendant O'Connor, on July 2, 2008. By permitting Radesca and O'Connor, two iStar fiduciaries bearing primarily responsibility for the Company's misleading statements and omissions, to retire and resign, rather than terminating their employment for cause, defendants wasted iStar's assets and signaled their intent not to hold any of the responsible officers and directors accountable for their misconduct.

10.     Defendants' misconduct has exposed iStar to potentially hundreds of millions of dollars in liability and defense costs in a series of securities class actions filed in this Court soon after iStar revealed its true financial condition. These actions allege that the Company and defendants Sugarman, Radesca, Rice, and O'Connor, among others, violated Sections 12(a)(2) and 15 of the Securities Act of 1933 and Sections 10(b) and 26(a) of the Securities and Exchange Act of 1934.

The cases were consolidated before United States District Court Judge Richard Sullivan (the "Securities Class Action"). On March 26, 2010, Judge Sullivan denied in substantial part the defendants' motion to dismiss the Securities Class Action and discovery is underway.

11.     iStar's credibility in the capital markets has been irreparably damaged. In the months following the disclosure of iStar's true financial condition, the full scope of the defendant's deception became clear, driving the stock ever lower. After initially losing $1.3 billion in market capitalization in the days following the February 28, 2008 disclosures, iStar's stock has continued to decline. By the close of trading on December 31, 2008, the last trading day of 2008, iStar's stock closed at just $2.23 per share, a $25.77 decline from its December 14, 2007 close, representing a loss of $3.2 billion in market capitalization loss.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2). Plaintiff is a citizen of Missouri. As alleged in paragraphs 16 to 26, defendants are citizens of states other than Missouri. The matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District, iStar is headquartered here, many of the witnesses reside in this District, and defendants conduct substantial business activities in this District.

## THE PARTIES

15.     Addie Vancil ("Plaintiff") is a shareholder of iStar and has been continuously since May 31, 2001. Plaintiff is a citizen of Missouri.

16.     Nominal defendant iStar is a Maryland corporation with its principal executive offices located at 1114 Avenue of the Americas, 39th Floor, New York, New York. iStar operates as a finance company focusing on the commercial real estate industry.

17.     Defendant Sugarman founded iStar in 1993 at which time he installed himself as iStar's CEO, a position he continues to hold. Sugarman is also iStar's Chairman of the Board and has been since April 2000. He has been a director since 1996. Sugarman is a member of iStar's Investment Committee and has been since at least April 2007. Sugarman is a member of iStar's Investment and Asset Management Committee and has been since at least April 2007. Sugarman signed the Registration Statement issued in connection with the Secondary Offering, made misleading statements at the Investors Day Conference, and certified the misleading November 9, 2007, 10-Q pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. iStar paid defendant Sugarman the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2009 | $1,000,000 | $1,999,000 | - | $10,568 |
| 2008 | $1,000,000 | - | $16,309,856 | $463,178 |
| 2007 | $1,000,000 | $3,000,000 | $5,109,217 | $482,336 |
| 2006 | $1,000,000 | $5,000,000 | $464,799 | $136,014 |

Defendant Sugarman is a citizen of New York.

18.     Defendant Robert W. Holman, Jr. ("Holman") is an iStar director and has been since November 1999. Holman is Chairman of iStar's Compensation Committee and has been since at least April 2009. Holman also is a member of the Audit Committee and has been since at least April 2007. He was Chairman of iStar's Audit Committee in 2008. Holman has been a member of the Investment Committee from at least April 2007 through at least April 2009. iStar paid defendant Holman the following compensation as a director:

- 6 -

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $197,000 | $64,718 | $5,000 | $266,718 |
| 2008 | $172,115 | - | $26,115 | $198,230 |
| 2007 | $126,750 | $88,166 | $45,534 | $260,450 |
| 2006 | $116,500 | $108,244 | $28,875 | $253,619 |

Defendant Holman is a citizen of Nevada.

19.     Defendant Robin Josephs ("Josephs") is iStar's Lead Director and has been since May 2007. He has been a director since March 1998. Josephs also is a member of iStar's Audit and Compensation Committees and has been since at least April 2007. Josephs was Chairman of iStar's Compensation Committee from at least April 2007 to at least April 2008, and Chairman of the Audit Committee in 2009. iStar paid defendant Josephs the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $196,100 | $110,944 | $2,150 | $309,194 |
| 2008 | $189,720 | - | $28,471 | $218,191 |
| 2007 | $158,750 | $108,433 | $45,457 | $312,640 |
| 2006 | $112,750 | $108,244 | $28,875 | $249,869 |

Defendant Josephs is a citizen of Illinois.

20.     Defendant George R. Puskar ("Puskar") is iStar's alternate Lead Director and has been since May 2007. He has been a director since November 1999. Puskar has served as Chairman of iStar's Investment and Asset Management Committee since at least April 2007. Puskar was a member of the Audit Committee in 2008. He rejoined the Audit Committee in April 2010. Puskar signed the Registration Statement issued in connection with the Secondary Offering. iStar paid defendant Puskar the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $157,600 | $64,718 | $5,000 | $227,318 |
| 2008 | $157,425 | - | $23,925 | $181,350 |
| 2007 | $144,500 | $88,166 | $42,876 | $275,542 |
| 2006 | $115,000 | $108,244 | $28,875 | $252,119 |

Defendant Puskar is a citizen of Florida.

21.     Defendant John G. McDonald ("McDonald") is an iStar director and has been since November 1999. McDonald is a member of iStar's Investment Committee and has been since at least April 2009. McDonald was a member of iStar's Compensation Committee from at least April 2007

to at least April 2008.  McDonald signed the Registration Statement issued in connection with the

Secondary Offering.  iStar paid defendant McDonald the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $106,000 | $64,718 | - | $170,718 |
| 2008 | $119,250 | - | $29,462 | $148,712 |
| 2007 | $122,750 | $88,166 | $52,189 | $263,105 |
| 2006 | $93,750 | $108,244 | $32,739 | $234,733 |

Defendant McDonald is a citizen of California.

22.     Defendant Jeffrey A. Weber ("Weber") is an iStar director and has been since June

2003.  Weber is a member of iStar's Compensation Committee and has been since at least April

2007.  iStar paid defendant Weber the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $118,400 | $64,718 | $5,000 | $188,118 |
| 2008 | $123,250 | - | $24,401 | $147,651 |
| 2007 | $109,000 | $88,166 | $42,876 | $240,042 |
| 2006 | $90,500 | $108,244 | $28,875 | $227,619 |

Defendant Weber is a citizen of New York.

23.     Defendant Glenn R. August ("August") is an iStar director and has been since May

2005.  August signed the Registration Statement issued in connection with the Secondary Offering.

iStar paid defendant August the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $88,000 | $64,718 | - | $152,718 |
| 2008 | $115,225 | - | $15,225 | $130,450 |
| 2007 | $76,000 | $88,166 | $24,900 | $189,066 |
| 2006 | $78,000 | $108,244 | $13,475 | $199,719 |

Defendant August is a citizen of New York.

24.     Defendant Dale Anne Reiss ("Reiss") is an iStar director and has been since July

2008.  Reiss is Chairman of iStar's Audit Committee and has been since at least April 2010.  Reiss

has served on the Audit Committee since at least April 2009.  Reiss is a member of the Investment

Committee and has been since at least April 2010.  iStar paid defendant Reiss the following

compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $184,047 | $64,718 | $5,000 | $253,765 |
| 2008 | $59,000 | $892 | - | $59,892 |

Defendant Reiss is a citizen of Florida.

25.      Defendant Rice was iStar's CFO from November 2002 to March 2009. Rice signed the Registration Statement issued in connection with the Secondary Offering, made misleading statements at the Investors Day Conference, and certified the misleading November 9, 2007, 10-Q pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Rice is a defendant in the Securities Class Action. iStar paid defendant Rice the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2009 | $65,625 | - | - | $1,010,186 |
| 2008 | $350,000 | $1,250,000 | $1,363,915 | $143,259 |
| 2007 | $350,000 | $1,250,000 | $1,532,740 | $204,173 |
| 2006 | $350,000 | $1,500,000 | $387,388 | $115,141 |

Defendant Rice is a citizen of New York.

26.      Defendant O'Connor was iStar's Chief Operating Officer from March 1998 to June 2008. O'Connor was also iStar's Executive Vice President from March 2000 to June 2008. O'Connor made misleading statements at the Investors Day Conference. O'Connor is a defendant in the Securities Class Action. iStar paid defendant O'Connor the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2007 | $350,000 | $1,250,000 | $747,281 | $169,408 |
| 2006 | $350,000 | $1,250,000 | $314,032 | $94,392 |

Defendant O'Connor is a citizen of Connecticut.

27.      Defendant Radesca was iStar's Chief Accounting Officer from December 2006 to February 2008. Radesca signed the Registration Statement issued in connection with the Secondary Offering. Radesca is a defendant in the Securities Class Action. Defendant Radesca is a citizen of Connecticut.

28.      The defendants identified in ¶¶17-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17, 25-27 are referred to herein as the "Officer

- 9 -

Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants" or the "Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

29.     By reason of their positions as officers, directors, and/or fiduciaries of iStar and because of their ability to control the business and corporate affairs of iStar, the Individual Defendants owed and owe iStar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage iStar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of iStar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to iStar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding to the Company's operations, financial performance, management, projections, and forecasts, and to ensure that the Company fully complied with the federal securities laws and regulations promulgated thereunder. During 2007, the Board met twenty-one times. During 2008, the Board met twenty-six times.

**Audit Committee Duties**

31.     iStar's Audit Committee Charter obligates members of the Audit Committee to: (a)"discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations'"; (b) "review and approve the Company's credit loss reserve policy and establishment of reserves on a quarterly basis"; (c) "discuss policies with respect to risk assessment and risk management"; and (d) "review the adequacy of management information systems, internal accounting and financial controls."

**Reasonable and Prudent Supervision**

32.     To discharge their duties, the officers and directors of iStar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of iStar were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate and reasonably founded statements about the Company's financial performance and future financial prospects;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to iStar's operations, and, upon receipt of notice or information indicating imprudent or unsound conditions or practices, or calling into question the accuracy of statements and filings published by the Company or its officers, make reasonable inquiry in connection therewith, and take steps to correct such conditions, practices, or statements, and make such disclosures as necessary to comply with securities laws;

(e)     refrain from acting upon material inside corporate information to benefit themselves; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, regulations, and duties to shareholders.

**Breaches of Duties**

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

- 11 -

Individual Defendants complained of herein involves the knowing violation and conscious disregard of their obligations as directors and officers of iStar and the absence of good faith on their part, including conscious disregard of misconduct on the part of other fiduciaries that each Individual Defendant was aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants was ratified by the other Individual Defendants, who collectively comprised all of iStar's Board.

34.    Each Individual Defendants breached his or her duty of loyalty and good faith by causing, approving, and/or failing to prevent the gross mismanagement of the Company, the publication of false and misleading statements regarding iStar's financial performance and prospects, including the adequacy of iStar's loan loss reserves, its actual earnings (had iStar's earnings been reduced as necessary to fund adequate loan loss reserves), the credit quality of iStar's loan portfolio, the mounting losses in the Company's portfolio, and waste of its assets. As a result of Defendants' illegal and faithless actions and course of conduct, the Company is now a defendant in the Securities Class Action. As a result, iStar has expended, and will continue to expend, significant sums of money defending itself in the Securities Class Action, and faces potentially hundreds of millions of dollars in liability.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was misrepresenting its business prospects and financial results; (ii) enhance the Individual Defendants' executive and directorial positions at iStar and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the investing

- 12 -

public, including shareholders of iStar, regarding the Individual Defendants' management of iStar's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by Defendants. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper statements and guidance.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

### BACKGROUND

41.     iStar makes and services commercial real estate loans, and buys and leases commercial office buildings. Between 2002 and 2005, historically low interest rates, widespread use of novel, high-risk loans (including no money down, interest only, adjustable rate and undocumented "Alt-A" loans), a broad loosening of lending standards, and a flood of capital from mortgage-backed

- 13 -

securities converged to reduce dramatically the cost of lending and spur unprecedented speculative real estate development. By early 2005, following years of 20% annual price appreciation, many of the Nation's most active real estate markets in Southern and Western states were seriously overheated, and the Federal Reserve reversed course, quadrupling interest rates (from 2% to 8.25%) by September 2007. As the Federal Reserve increased the pace of rate hikes in 2005, the risky loans made to speculators and poor credit risks began to reset at higher rates that were unattractive to speculative investors and unaffordable to many owners and prospective buyers. As wave after wave of loans slipped into delinquency and non-performance, lending standards were tightened. Broadly reduced buying power, unsustainable bubble prices and vanishing speculative demand led to an avalanche of defaults and foreclosures. As is now well-documented, the collapse in residential real estate demand devastated banks and cut off the spigot of easy capital, as lending standards tightened and investors began to question the value of the collateral securing hundreds of billions of dollars of mortgage-backed securities and other collateralized debt obligations ("CDOs"). The damage quickly spread to commercial real estate and lending.

42.    As interest rates increased, the warnings of a broad real estate market collapse rapidly mounted. On April 26, 2006, national homebuilder Centex Corporation reported that it was slashing its earnings forecast due to falling sales and prices. In May 2006, homebuilders Toll Bros., Inc., and Hovnanian Enterprises, Inc., announced that new orders had fallen at least 20%. On June 5, 2006, Wachovia's housing analyst reported that home builders faced a 35% jump in new and existing home inventory from the comparable period in 2005. In August, 2006, *Dow Jones Newswire* reported on the extraordinary numbers of borrowers opting to default on their home loans as interest rates rose, home and condominium prices declined, and demand for housing collapsed. The number of subprime mortgages with at least one delinquent payment *within the first three months* after origination had increased by 14% year-over-year.

43.    Not surprisingly, subprime lenders were among the first financial institutions to be damaged by falling home prices, increasing mortgage delinquencies, and slackening investor interest in residential mortgage-backed securities, as doubts about the quality of the collateral underlying

these instruments mounted. The first casualty was Merit Financial, a Washington-based lender that filed for bankruptcy on May 5, 2006. New Century Financial Corporation declared bankruptcy on April 2, 2007, citing rising delinquencies, non-performance, defaults, and an inability to securitize and sell its loans to fund new originations. On January 3, 2007, Ownit Mortgage Solutions, a California based subprime lender, filed for Chapter 11 and defaulted on approximately $93 million owed to Merrill Lynch. On February 5, 2007, Mortgage Lenders Network USA, the fifteenth largest subprime lender with over $3.3 billion in loans funded in the third quarter of 2006 alone, filed for Chapter 11. On February 13, 2007, ResMae Mortgage Corporation filed for Chapter 11. People's Choice Home Loans filed for Chapter 11 in March 2007, just a few weeks later. SouthStart Funding LLC, filed for Chapter 7 in April 2007. Other lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

44.     Fremont General Corporation was particularly hard hit by the downturn in the housing market. On August 8, 2006, it announced that its net income declined 43% due in a large part to "increased levels of early payment delinquencies." At that time Fremont General Corporation stated that its average first mortgage FICO score was 624, and loan to value ratio was 81%.

45.     On March 2, 2007, Fremont General Corporation reported that it had entered into a agreement with the FDIC requiring it to cease and desist from (among other things): "Operating with inadequate underwriting criteria"; "Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses"; "Operating with a large volume of poor quality loans"; "Engaging in unsatisfactory lending practices"; and "Making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms."

46.     Despite the overwhelming evidence of a broad-based crash in the U.S. real estate and credit markets and Fremont General Corporation's noted inadequate underwriting, Defendants proceeded with the Fremont acquisition. On May 22, 2007, Defendants announced a definitive agreement to purchase Fremont General Corporation's commercial real estate lending business and interests in its commercial real estate loan assets. In this transaction, iStar would acquire approximately 285 commercial first mortgage loans from Fremont. 60% of the value of these loans

was collateralized by apartment and other types of residential properties. Condominium construction and conversion projects represented approximately 45% of the total portfolio. Fremont's portfolio was concentrated in Atlanta, Phoenix, Southern California, Dallas, Chicago, and Bethesda, Maryland (just outside of Washington D.C.), some of the most seriously overheated real estate markets in the Nation, and among the first to feel the effects of the market reversal in 2006.

47.     iStar paid Fremont approximately $1.9 billion in cash and transferred to Fremont a senior A-participation interest in the acquired portfolio of loan assets representing a 70% interest in the portfolio. iStar retained a 30% B-participation interest in the portfolio of loan assets with a $2.1 billion principal amount.

48.     To finance the Fremont acquisition, the Company obtained a $2 billion bridge facility, set to mature in 2008. In addition, Defendants agreed to fund up to approximately $4.4 billion of unfounded loan commitments associated with the acquired loan portfolio. The Company stated in its May 22, 2007, press release that it planned to replace the bridge facility through the issuance of debt and equity securities.

49.     On July 2, 2007, iStar, under the Individual Defendants' direction, completed the $6.27 billion Fremont acquisition. Soon after the deal closed, the Individual Defendants learned that the acquisition would prove disastrous for the Company because the deal included billions of dollars worth of poorly collateralized construction loans and funding commitments to condominium developers in some of the most overheated markets in the country and among the areas hit earliest and hardest by the real estate collapse and ensuing credit crisis. As set forth below, the Individual Defendants, knowingly or in conscious disregard of these facts, caused or permitted iStar to conceal the impact that the Fremont acquisition had and would have on the Company's corporate debt and loan portfolio, as well as the devastating impact that the general decline in real estate values and credit quality was having and would in the future have on iStar's earnings.

### IMPROPER STATEMENTS

50.     The Individual Defendants' fiduciary duties of care, good faith, and loyalty to iStar and its shareholders entail the duty to ensure that the Company's public filings and statements fairly

and honestly represent the operations, financial results and business prospects of the Company. In order to carry out these duties, the Individual Defendants must know and understand the facts material to iStar's core operations and financial performance, especially with regard to those metrics that are required to be disclosed under GAAP and those that the Company has elected to feature in its public statements. The Individual Defendants were required to ensure the disclosure of any non-public information necessary to render the Company's public statements and filings not misleading.

51. The Individual Defendants breached their duty to communicate honestly with shareholders and to ensure the Company's compliance with the law by knowingly and/or in conscious disregard of the oversight duties permitting the publication of misleading statements regarding the quality of the Company's debt portfolio, the adequacy of its loan loss reserves, and the performance of the Company's portfolio, and omitting material negative information regarding the rapidly mounting losses in the Company's portfolio and dramatic rise in non-performing loans. The Officer and Director Defendants alike owed a fiduciary duty to iStar and its shareholders to ensure that the Company properly disclosed all material facts concerning the Company so as not to mislead its shareholders.

52. In the course of their duties as officers responsible for iStar's core lending operations, public reporting, and evaluating and integrating iStar's material acquisitions, including the Fremont acquisition, the Officer Defendants reviewed this information in the form of periodic and special reports and data compilations generated to facilitate management of the Company, and discussed this material information with their fellow officers in *ad hoc* and formal management meetings, and, on information and belief, with the Director Defendants, in reports and presentations and in management's meetings with the Board and its committees, including the Audit Committee. On information and belief, the Director Defendants had ample opportunity to review and discuss, and did review and discuss, this material information with the Officer Defendants and with their fellow directors at *ad hoc* and formal meetings of the Board and its committees. In breach of their fiduciary duties, the Individual Defendants knowingly and/or in conscious disregard of their duties caused,

- 17 -

approved or otherwise permitted through their actions and/or inaction, the following improper statements to be disseminated by iStar to its shareholders and the investing public.

**The Prospectus and Registration Statement**

53.    On or about May 1, 2007, the Individual Defendants caused or allowed iStar to file a registration statement with the Securities and Exchange Commission ("SEC") on Form S-3 relating to an offer to sell, over time, common stock, preferred stock, depository shares debt securities and warrants of the Company (the "Registration Statement"). This Secondary Offering was a "shelf registration" that allowed iStar to register securities for sale, while leaving them on the "shelf" until the Company determined to conduct the Secondary Offering, *provided*, however, that the Registration Statement met all the requirements prescribed under applicable securities regulations, including that the information contained therein be current and not materially misleading. The Registration Statement was signed by defendants Sugarman, Rice, Radesca, August, McDonald, and Puskar.

54.    On or about October 10, 2007, the Individual Defendants caused or allowed iStar to file a prospectus with the SEC in support of an offering of convertible senior floating rate notes. The prospectus contained a section titled "Recent Developments," which described the Company's loan portfolio and its acquisition of Fremont. The prospectus provided in pertinent part:

> On July 2, 2007, we acquired the commercial real estate lending business of Fremont Investment & Loan, or Fremont, a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement, dated May 21, 2007. *We acquired approximately 285 commercial mortgage loans in the transaction, substantially all of which are first mortgage loans. Approximately 60% of the loans, by carrying value, as of June 30, 2007, are collateralized by apartment and other types of residential properties located throughout the United States.* The balance of the loans are collateralized by a variety of property types. Approximately 130 employees of Fremont located in eight offices throughout the United States joined our company at the closing of the transaction.
>
> *The aggregate principal amount of the loans that we acquired was approximately $6.3 billion as of June 30, 2007.* As of that date, approximately $500 million principal amount of the loans were non-performing loans. We paid Fremont approximately $1.9 billion in cash and concurrently sold to Fremont a senior A-participation interest in the acquired portfolio of loan assets, representing an approximately 70% interest in the portfolio. We retained a 30% B-participation

- 18 -

interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount. Our B-participation interest is in the first loss position with respect to the portfolio. *In addition, we have agreed to fund up to approximately $3.7 billion of unfunded loan commitments associated with the portfolio. We will hold title to all of the loans and will be solely responsible for asset management and loan servicing.*

55.    On or about October 12, 2007, the Individual Defendants caused or allowed iStar to file a prospectus supplement with the SEC in support of an offering of $800 million worth of convertible senior floating rate notes. The prospectus supplement contained a section titled "Recent Developments," which described the Company's loan portfolio and its acquisition of Fremont. The prospectus provided in pertinent part:

On July 2, 2007, we acquired the commercial real estate lending business of Fremont Investment & Loan, or Fremont, a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement, dated May 21, 2007. We acquired approximately 285 commercial mortgage loans in the transaction, substantially all of which are first mortgage loans. Approximately 60% of the loans, by carrying value, as of June 30, 2007, are collateralized by apartment and other types of residential properties located throughout the United States. The balance of the loans are collateralized by a variety of property types. Approximately 130 employees of Fremont located in eight offices throughout the United States joined our company at the closing of the transaction.

The aggregate principal amount of the loans that we acquired was approximately $6.3 billion as of June 30, 2007. As of that date, approximately $500 million principal amount of the loans were non-performing loans. We paid Fremont approximately $1.9 billion in cash and concurrently sold to Fremont a senior A-participation interest in the acquired portfolio of loan assets, representing an approximately 70% interest in the portfolio. We retained a 30% B-participation interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount. Our B-participation interest is in the first loss position with respect to the portfolio. In addition, we have agreed to fund up to approximately $3.7 billion of unfunded loan commitments associated with the portfolio. We will hold title to all of the loans and will be solely responsible for asset management and loan servicing.

56.    On November 9, 2007, the Individual Defendants caused or allowed iStar to issue its third fiscal quarter 2007 earnings press release. The third quarter 10-Q was incorporated by reference in the Registration Statement. For the quarter, iStar reported record earnings of $1.07 per share or $135.8 million. Sugarman and his executive team, with the Board's knowing acquiescence, claimed that "*[t]his quarter's risk ratings process included a comprehensive review of the Fremont*

- 19 -

***portfolio*.**" Based on this purportedly comprehensive review, the Individual Defendants told shareholders:

> At September 30, 2007, first mortgages, participations in first mortgages, senior loans and corporate tenant lease investments collectively comprised 86.0% of the Company's asset base, versus 83.6% in the prior quarter. The Company's loan portfolio consisted of 78% floating rate and 22% fixed rate loans, with a weighted average maturity of 3.2 years.

> The weighted average last dollar loan-to-value ratio for all structured finance assets was 66.6%. At quarter end, the Company's corporate tenant lease assets were 95.6% leased with a weighted average remaining lease term of 11.2 years. At September 30, 2007, the weighted average risk ratings of the Company's structured finance and corporate tenant lease assets were 2.92 and 2.48, respectively, versus 2.78 and 2.50, respectively, in the previous quarter.

> ***Inclusive of the assets acquired in the Fremont acquisition, at September 30, 2007, the Company had 29 loans on non-performing loan (NPL) status representing $848.7 million of gross book value. At the end of the third quarter, the Company had 28 loans on its watch list representing $1.1 billion of gross book value.*** Gross book values represent iStar's book value plus Fremont's A-participation interest. ***Excluding Fremont's A-participation interest on the associated assets, NPL and watch list assets were $428.7 million and $610.5 million, respectively.*** The Company's policy is to stop the accrual of interest on loans placed on NPL status. ***The Company believes it has adequate collateral and loan loss reserves to support the book value for each of the NPL and watch list assets.***

> ***The Company had $124.2 million in loan loss reserves at September 30, 2007*** versus $52.2 million at December 31, 2006. ***The third quarter increase of $62.0 million in loan loss reserves was the result of the Company's regular quarterly risk ratings review process as well as the addition of the Fremont portfolio. This quarter's risk ratings process included a comprehensive review of the Fremont portfolio.***

> ***The Company's total loss coverage, defined as the combination of loan loss reserves and remaining purchase discount from the Fremont acquisition, was $344.9 million or 3.2% of total loan assets at the end of the third quarter.***

57. On December 13, 2007, the Individual Defendants caused or allowed iStar to file a preliminary prospectus in support of an offering of 6 million iStar common shares. Four days later, on December 17, 2009, they amended the prospectus to increase the number of shares offered to 8 million iStar common shares. As alleged below, both prospectuses failed to disclose material

information concerning the substantial degradation of the credit quality of iStar's corporate debt and loan portfolio over the intervening quarter or the material inadequacy of iStar's loan loss reserves.

58.     The Individual Defendants filed the Registration Statement on Form S-3, a stream-lined registration statement form reserved for well-capitalized, widely followed issuers. Such issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings – *e.g.*, Forms 10-K and 10-Q. Instruction 11(a) of Form S-3 requires issuers utilizing Form S-3 to disclose "*any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K* filed under the Securities Exchange Act of 1934."

59.     Accordingly, an issuer utilizing Form S-3 must update the information in its periodic filings, including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations[,]" because Item 303(a) of Regulation S-K requires issuers to disclose this information in periodic SEC filings. Item 303(a) requires issuers to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

60.     Defendants never updated the Registration Statement to disclose several "material changes" to iStar's continuing operations due to the Fremont acquisition and the substantial deterioration of credit quality in iStar's portfolio over the intervening quarter, as required under Instruction 11(a), including: (a) the material decline in the Company's debt security values; (b) the material increase in the Company's loan losses; and (c) the material decline in the credit quality of iStar's loan portfolio. In addition, the risk factors incorporated by reference into the Registration Statement failed to warn of the problems in the Company's corporate loan and debt portfolio.

61.     By the time of the Secondary Offering, and unbeknownst to shareholders, the amount of unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million, surging nearly 100% since the end of iStar's third quarter, which ended on September 30,

2007. These increased losses represented more than twenty percent of all income from continuing operations iStar reported during the first three quarters of 2007.

62.     In particular, the Company incurred material incremental losses on its undisclosed Linens 'n Things ("LNT") and WCI Communities ("WCI") debt securities, the value of which were linked to the declining real estate markets, about which Sugarman had claimed to have superior knowledge and foresight. At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy. In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering.

63.     At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy. In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering. Defendants knew that iStar's held-to-maturity investments had experienced a material decline in the value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007 as the prices of the debt securities of LNT and WCI had traded in the bond market at severely depressed prices for an extended period of time. Defendants also knew that applicable accounting standards required that the Company record a charge for the impairment in of iStar's held-to-maturity investments during the fourth quarter of 2007.

64.     The Individual Defendants knew or consciously disregarded the following adverse facts about WCI before the Secondary Offering:

- On November 7, 2007, *PrimeNewsWire* reported that Jerry Starkey, President and CEO of WCI stated "this prolonged downturn requires that we continue to assess our overhead and make reductions in order to remain viable through the trough of this cycle" and that "WCI announced another significant reduction to its workforce in response to continued soft demand in its markets." WCI combined several lines of business, implemented a net reduction in force of about 575 employees, which, when combined with previous reductions in force represented a 46% decline from its 2006 employment level, and its board of directors significantly reduce its compensation with six board members agreeing to forego all director compensation.

- On November 8, 2007, *The Associated Press* reported that "Moody's cut its credit ratings on struggling Florida homebuilder WCI Communities Inc. deeper into junk

status and suggested they could move even lower as the housing slump worsens." The credit rating agency cut WCI's corporate family rating to Caa2 from B3, and the ratings on its senior subordinated notes to Caa3 from Caa2. Moody's cited WCI's "substantially weaker-than-expected cash flow generation, continued difficulties in complying with bank covenants, accelerating losses and increasing debt leverage."

- By November 12, 2007, the shares of WCI traded at a *ten* year low, declining from more than $20 per share in early 2007 to less than $5 per share at the time of the Secondary Offering. On November 15, 2007, WCI reported that EBITDA for its twelve months ended September 30, 2007 was a negative $(62,064,000), compared with a positive EBITDA of $288,411,000 for the prior comparable twelve months.

- On November 27, 2007, *The New York Sun* reported, "A Banc of America Securities analyst, Daniel Oppenheim, is one of a number of homebuilding analysts who takes a dim view of WCI, which is awash in red ink. In its most recent quarter, WCI reported a loss of $1.66 a share, much greater than Street expectations, in large part due to higher charges. Liquidity issues are likely to increase, Mr. Oppenheim warns, citing a deteriorating cash flow outlook. The company has reported it is not in compliance with its fixed-charged covenant and the analyst expects lenders to be less flexible in renegotiations, given the deterioration in Florida. Even if a favorable income is reached, WCI will have just $210 million in liquidity, which Mr. Oppenheim believes will quickly erode."

- On November 20, 2007, *Thomson Financial News* reported, "Standard & Poor's Ratings Services lowered its junk corporate credit rating on WCI Communities Inc to 'CCC' from 'CCC+', citing a sharp spike in cancelled contracts to buy the company's luxury high-rise condominiums and the company's need to once again renegotiate the terms of its revolving credit facility. The outlook on WCI remains negative."

- On December 3, 2007, *Market News Publishing, Inc.*, reported "Of the 24 builders Standard & Poor's rates, five are currently in the 'BBB' category, seven are in the 'BB' category, and 10 are in the 'B' category. The other two companies have fallen into the low speculative-grade realm: WCI Communities is rated 'CCC' and TOUSA is rated 'CC'. U.S. homebuilders face an array of challenges at this point in the housing cycle, many of which will likely worsen before they improve. While unit deliveries were up in the recent fiscal quarter, there's little evidence to suggest that companies will be able to quickly replenish shrinking order backlogs. Additionally, impairment charges were huge in the recent fiscal quarter, as builders wrote off $6 billion on inventory, goodwill, and option deposits as home prices continued to drift lower and absorption slowed."

- In its Form 10-Q for the quarter ended September 30, 2007, WCI disclosed that is was not in compliance with a debt covenant under a revolving credit facility and term loan agreement.

65. The Individual Defendants knew or consciously disregarded the following adverse

facts about LNT before the Secondary Offering:

- On August 15, 2007, Deutsche Bank Securities reiterated its Sell rating on LNT's
  bonds.

- On October 2, 2007, Fitch Ratings Downgraded LNT as follows: Issuer Default
  Rating (IDR) to 'CCC' from 'B-'; Asset-based revolver to 'B-/RR2' from 'B+/RR2';
  Senior secured notes to 'CCC-/RR5' from 'CCC/RR6'. The Rating Outlook is Stable.
  The downgrades reflected LNT's continued weak operating performance which has
  resulted in worsening credit metrics and negative cash flow generation as well as the
  challenging operating environment and intense competition from other specialty
  retailers, discounters and department stores in the home furnishings segment.

- On October 15, 2007, *Standard & Poor's Ratings Services* cut its corporate credit
  rating on LNT to 'B-' from 'B' and removed the ratings from CreditWatch, where they
  had been placed with negative implications on Nov. 17, 2006, and lowered the bank
  loan rating on the Company's $650 million floating-rate senior secured notes to 'CCC'
  (two notches below its corporate credit rating). The downgrade was a result of LNT's
  "continued weak operating performance and poor profitability and productivity
  relative to its key competitor" as well as a "very high debt leverage and extremely
  thin interest coverage." *Standard & Poor's* stated that the outlook was negative.

- On November 13, 2007, LNT reported that adjusted EBITDA for the third quarter of
  2007, the quarter ended September 30, 2007 was negative ($3) million compared
  with adjusted EBITDA of positive $21.5 million in the third quarter of 2006, a
  decrease of $24.5 million

66. Defendants also failed to disclose that the approximate $60 million incremental

unrealized loss on iStar's held-to-maturity investments constituted a "material change" in the

Company's operations. Since this incremental loss was then having, and would in the future have a

material and unfavorable impact on the Company's operating income, Defendants were required to

disclose these facts in the Registration Statement.

67. On February 28, 2008, in connection with announcing its financial results for the

fourth quarter of 2007 and fiscal year 2007, which ended December 31, 2007, iStar announced that it

recorded a $135 million charge associated with the "impairment of two credits." The facts that

caused the Company to take this material charge as of December 31, 2007, existed on December 14,

2007, the date of the Secondary Offering, and were required to be disclosed in the Registration

Statement. They were not, and shareholders and investors were misled.

68.     Defendants blamed iStar's disappointing 2007 fourth quarter financial results on the impairment charge it recorded on its held-to-maturity investments in WCI and LNT, admitting that the charge iStar recorded in connection with the decline in value of these debt securities had a material negative impact on the Company's continuing operating results during the fourth quarter of 2007, before the prospectuses were revised and the Secondary Offering was conducted.

69.     The Registration Statement also failed to disclose that losses in iStar's loan portfolio increased dramatically between September 30, 2007, and the time of the Secondary Offering.

70.     During the fourth quarter of 2007, the economic and financial conditions material to the credit quality of iStar's loan portfolio deteriorated significantly and had a material adverse effect on market liquidity generally and the value of iStar's loan portfolio specifically.

71.     During the first nine months of 2007, iStar recorded a cumulative $72 million charge against earnings for loan losses. For the fourth quarter of 2007 – a period covering just the last *three* months of 2007 alone – iStar recorded a *$113 million charge for loan losses. This amount exceed the total loan losses iStar reported during the first nine months of 2007 combined by 57%* and amounted to approximately *forty percent of all of the income iStar reported from continuing operations during the first nine months of 2007*.

72.     There was no sudden decline in credit quality over the two months following the Secondary Offering that created a sudden need to record this enormous charge. Defendants knew that iStar's loan portfolio had experienced a material decline in value between September 30, 2007, and the time of the Secondary Offering on or about December 14, 2007. As defendant O'Connor touted at the Investors Conference held just days before the Secondary Offering, Sugarman's management team monitored credit risk in iStar's loan portfolio on a real-time basis: "*We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.*"

73.     Defendants also failed timely to record at least the $110 million incremental increase in iStar's loan loss reserves that were finally recorded on February 28, 2008. iStar's loan loss

- 25 -

reserves had been artificially suppressed for months in relation to the accelerating pace of the decline in credit quality observed in its loan portfolio, which permitted them to report artificially inflated earnings leading into the Secondary Offering. These facts constituted a "material change" in the Company's operations that would have a material negative impact on operating income. As such, they were required to be disclosed in the Registration Statement and to shareholders in previous statements and filings. The disclosure of a $110 million increase in iStar's loan loss reserves would have materially altered the total mix of information available to investors in the Secondary Offering and to shareholders.

74.     On February 28, 2008, in connection with announcing its financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, iStar announced, among other things, that it recorded a $113 million charge to earnings as a result of its increase in loan loss reserves. The facts that caused the Company to take this charge as of December 31, 2007, existed on and before the December 14, 2007, Secondary Offering, and were required to be disclosed in the Registration Statement. They were not, and investors and shareholders were misled.

75.     iStar blamed its disappointing 2007 fourth quarter financial results on the charge it recorded and the increase in its loan loss reserves. Accordingly, by Defendants' own admission, the charge iStar recorded in connection with the decline in value of its loan portfolio negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

76.     The Registration Statement also failed to disclose the material increase in iStar's NPLs ("Non-Performing Loans") and Watch List assets over the intervening quarter.

77.     By the time of the Secondary Offering, on or about December 14, 2007, *the carrying value of iStar's NPLs had increased by more than 50% since September 30, 2007* and *the carrying value of iStar's Watch List assets had increased by approximately 100% since September 30, 2007.*

78.     Defendants knew that between September 30, 2007, and the December 14, 2007, Secondary Offering, the credit quality of iStar's loan portfolio declined precipitously, causing a sharp spike in NPLs and Watch List assets by the time of the Secondary Offering. Just days before the Secondary Offering, *defendant O'Connor told investors at the Investors Conference that iStar*

- 26 -

*management inspected the 4 and 5 rated loans that composed 92% of iStar's NPLs and Watch List*
*assets "every week, if not more."*

79.     Item 3 of Form S-3 required Defendants to furnish this information in the Registration Statement pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], which calls for, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

80.     The Registration Statement incorporated by reference the "Risk Factors" set forth in iStar's 2006 Form 10-K. None of these so-called risk disclosures meaningfully advised investors in the Secondary Offering of the problems in the Company's corporate loan and debt portfolio and their impact on the Company's operations. Impairment and credit issues were characterized in these warnings as potential future risks when, in fact, those risks had materialized and materially impacted the results of operations, as well as the Company's future prospects. Indeed, the crisis in the U.S. real estate and credit markets had progressed dramatically since iStar had filed its 2006 Form 10-K with the SEC, and Defendants did nothing to revise these warnings to incorporate this new information and its impact on iStar before the December 14, 2007 Secondary Offering.

81.     As such, the Registration Statement failed to disclose the most significant factors that made the Secondary Offering risky or speculative as required by Item 3 of Form S-3, including the extent to which deterioration in the real estate and credit markets had damaged the credit quality of iStar's loan portfolio.

**Inaccurate Financial Statements**

82.     As alleged above, the Registration Statement and the prospectus (including their supplements and amendments) incorporated by reference the financial statements contained in iStar's 2006 Annual Report on Form 10-K and its 2007 Quarterly Reports on Form 10-Q.

83.     The unaudited financial statements included in the Third Quarter 10-Q were materially inaccurate in that they failed to disclose facts, referred to under GAAP as "subsequent events," evidencing the adverse conditions that were reasonably likely to have a material effect on the value the Company's investments in debt securities and the credit quality of its loan portfolio. GAAP required that these facts be disclosed, and they were necessary to make the interim financial

statements not false and/or misleading. Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") AU §411.02.

84.    GAAP, in its Emerging Issues Task Force ("EITF") Topic D-86, provides:

A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

85.    In defining subsequent events that must be disclosed, EITF Topic D-86 refers to the American Institute of Certified Public Accountant's ("AICPA") Statement on Auditing Standards ("SAS") No. 1, *Subsequent Events* (or AU §560), which states in relevant part:

[E]vents or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements. These occurrences hereinafter are ref erred to as "subsequent events."

The first type [of subsequent event] consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements ....

*The second type [of subsequent event] consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements. Some of these events, however, may be of such a nature that disclosure of them is required to keep the financial statements from being misleading* ....

\* \* \*

When financial statements are reissued, for example, in reports filed with the Securities and Exchange Commission or other regulatory agencies, events that require disclosure in the reissued financial statements to keep them from being misleading may have occurred subsequent to the original issuance of the financial statements.

- 28 -

86.     iStar's financial statements in the Third Quarter 10-Q falsely represented that "[t]he accompanying unaudited Consolidated Financial Statements have been prepared in accordance with the instructions to Form 10-Q and Article 10-01 of Regulation S-X for interim financial statements."

87.     Article 10 of Regulation S-X [17 C.F.R. §210.10-01.(a)(5)] provides, in pertinent part that:

- Interim financial information shall include disclosure either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading;

- Disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant; and

- Where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred.

88.     Defendants misrepresented that the interim financial statements were presented in conformity with the requirements of Article 10 of Regulation S-X. As alleged above, by the time the Registration Statement was declared effective by the SEC, the deteriorating economic and financial conditions had a material adverse effect on the value of iStar's loan portfolio.

89.     These material "subsequent events," which were required to be disclosed pursuant to GAAP and the requirements of Article 10 of Regulation S-X, were omitted from the financial statements incorporated by reference in the Registration Statement and Prospectus.

90.     Accordingly, Defendants misrepresented in the Registration Statement and prospectus that its financial statements were presented in conformity with GAAP and Article 10 of Regulation S-X, rendering the Registration Statement materially inaccurate.

91.     In addition to the GAAP violations alleged above, the financial statements incorporated by reference in the Registration Statement were presented in violation of at least the following provisions of GAAP:

        (a)     The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred (Statement of Financial Accounting Standard No. 5);

        (b)     The principle that financial statements disclose significant risks and uncertainties (Statement of Position No. 94-6);

- 29 -

(c)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Statement of Concepts ("Concepts Statement") No. 1 ¶34);

(d)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1 ¶40);

(e)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (Concepts Statement No. 1, ¶50);

(f)    The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(g)    The concept of completeness, which requires the inclusion of all information that may be necessary to ensure that reported results validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(h)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (Concepts Statement No. 2, ¶¶95, 97).

92.    The failure to incorporate by reference in the Registration Statement financial statements that conformed to the requirements of GAAP and Regulation S-X rendered the Registration Statement materially inaccurate.

**The Investors Day Conference**

93.    On December 6, 2007, iStar held its 2007 Investors Day Conference at the New York Public Library.  At the conference, iStar and its management made presentations concerning the

Company's balance sheet, the results of operations and its investments, among other things. iStar's officers and directors made several misleading statements to shareholders, potential investors, and analysts in attendance regarding iStar's risk profile. Consistent with Sugarman's shrewd marketing pitch of iStar's management team as the smartest in the business, defendants Sugarman, O'Connor, and Rice told investors and shareholders in no uncertain terms that iStar faced fewer risks than other mortgage lenders in the unfolding real estate and credit market corrections because iStar's management and Board closely monitored and conservatively valued and reserved iStar's loan portfolio. These statements imparted a false sense of confidence and were highly misleading

94.     Defendant O'Connor touted the fact that iStar's senior managers "flag internally" significant non-performing loans and "are talking about [them] every week[,]" and misleadingly claimed that, unlike other real estate lenders, iStar took a uniquely conservative approach to lending and reporting on credit quality:

*We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis ... [a]nd what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values....*

95.     Defendant Sugarman misleadingly touted iStar's "balance sheet strength[,]" telling investors and shareholders that iStar's business was "fundamentally different" than other lenders, that its debt was far better collateralized, and that iStar was far more "safe and secure":

And I point this out simply to start the meeting by saying *the strength of our balance sheet has always been one of the strongholds of the iStar story... our debt is extremely well protected ...* I think *it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year....* And we think *it's a fundamentally different business, it's a different underwriting and it's so much more safe and so much more secure that these ratings are very misleading*.

96.     Sugarman went on to tell investors and shareholders that iStar was so well-positioned that the real estate and credit market corrections would actually redound to the Company's benefit as weaker rivals' access to capital dried up:

I guess it's fair to say *it's been a very interesting year to date*, and one we like to sum up as, "Be careful what you wish for." As many of you have heard me say many times before, *we've been very surprised and disappointed with the relative ease at which new finance companies in our space have been able to access extraordinary levels of leverage based on we thought business plans that were far inferior to the iStar enterprise*.

As you'll hear later today, *we've spent a lot of time trying to craft our business strategies to stay away from that capital, and I think what we hope was a correction in the credit and finance markets would really demonstrate the flexibility, the balance sheet strength and the opportunities embedded in having an unsecured, investment-grade model*.

Now, this slide [infra], which you're going to see a couple of times today, highlights the conservative level of leverage that we see in almost all corporate ratings of real estate finance companies, and we like to compare that with the very aggressive levels of leverage we have seen in the structured credit market over the past couple years.

And as we've pointed out in many presentations, what's really striking is the relative value, represented by bonds issued out of this corporate family, compared to this slice of the structured credit market, despite similar ratings, BBB, BAA2, in our case. And *I want to do some quick comparisons for you*. We're going to come back to this slide a couple of times, but *it's important to start with the strength of this business model.* So I guess I picked iStar Financial. Obviously, we have a viewpoint on our own credit, but I think you'll see this comparison works in a lot of other companies' case, as well.

*When you're buying bonds in the iStar enterprise, you're buying a $15 billion unencumbered asset pool across multiple assets, originated in multiple years, in multiple parts of the commercial real estate world*. This is a very strong sponsored CDO. It's one of probably the best in the business. It was issued in 2006. It has about $1 billion of assets, so a fraction of the size. Almost all of the assets are originated at the same time, and, candidly, the top 10 assets in that pool, it's a 30-asset pool, represent 52% of the balance of that entire $1 billion capital stack. So we've got a very concentrated portfolio. This portfolio, again, much more diversified, top 10 assets about 12%. *That's over $3 billion of tangible equity sitting underneath, protecting those bondholders. Over here, you've got a little over $100 million*.

97.     In discussing the Company's non-performing loans portfolio and high risk loans, the Individual Defendants represented that iStar's management fully understood the quality issues in iStar's loan portfolio and took a conservative approach to loan loss reserves, maintaining more than adequate reserves to address probable loan losses.

98.     Defendant O'Connor stated in no uncertain terms that Defendants knew exactly what was happening with credit quality in iStar's portfolio, and that iStar was simply not exposed to the

risk of major loan losses despite fast deteriorating market conditions. According to O'Connor, "[W]e devote a lot of people, a lot of assets and a lot of resources to watching the portfolio. We have 135 people that all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets." On that basis, O'Connor claimed:

> *we as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they become real problems.... Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected....* And again, from our perspective, *no surprises here, no surprises*, and *I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to*.

99. Defendant O'Connor went on to pitch iStar's uniquely high credit quality, and assured investors and shareholders that the Fremont acquisition did not change that picture. Despite the Fremont acquisition, Defendant O'Connor encouraged investors and shareholder to "take comfort" that the Company's loss exposure in its loan portfolio was well-understood and very limited due to: (1) the amount of borrower equity in the Company's portfolio; (2) the percentage of senior loans in the Company's portfolio; and (3) amount of the Company's loan loss reserves. O'Connor explained:

> I want to talk a little bit about NPLs [Non-Performing Loans] and watch lists over the next several pages. We do have 29 assets on NPL, so 642 investments in the portfolio. We currently have 29 assets on NPL. That's less than 3% of the total assets on our balance sheet ... .
>
> [W]e do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists.
>
> * * *
>
> *I would say we take comfort in three things. One, let's look at how much borrower equity there is in our portfolio. That's kind of the first line of defense.* That's going to determine what's the probability that we're going to get nicked, okay? And then *the second line of defense is let's look at our position. And we're talking again about senior, secured positions. Historically, senior, secured positions, the severity of loss of those positions is less. It has been, and will be.* So borrower equity, first mortgage position, and then *if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves. We have $125 million or $124-ish million of on balance sheet reserves*.

- 33 -

*We've grown that number [loan loss reserve]. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio. So if you step back and look at it, we have available to us as kind of a bucket to address these issues, $345 million. It's a lot of money to address issues in the portfolio.*

\* \* \*

Okay, try to back up, summarize and have Jay come up here. Started by talking about *Fremont, integration's going well, not quite done yet, lots of progress. We have a bigger portfolio today than we had a year ago. We do. We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion. In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business. The good news is, as much as the markets are noticeably worse today, materially worse than they were a year ago, our on-balance sheet reserve, our cushion, is significantly greater than it was a year ago.* And then lastly, just the point again, lots of unencumbered assets. And then finally, *we have what we believe is the right team in what is a very difficult, and we think will be a difficult environment for the next 12 to 24 months. We've got the right team on the ground, process in place, to work our way through this.*

100.    Defendant Rice, in turn, highlighted iStar's financial performance, minimized the

Company's short-term capital requirements, and even announced that the Fremont acquisition would

enable the Company to disburse a special dividend:

As you've heard on our third quarter earnings call, we've had solid year-to-date financial performance, with adjusted earnings up 11% and revenues up 45% from the same period in 2006. *We announced 2008 adjusted earnings guidance of $4 to $4.20. And we continued to deliver strong returns at reasonable leverage levels. We announced a 5% increase to our quarterly dividend, which will be payable in the fourth quarter.* And *due to the increase in income that we're receiving from the Fremont portfolio, we'll be declaring a special dividend in 2007 that should be in the range of $0.15 to $0.30 a share.* Typically, we consider dividend increases in the first quarter.

101.    These statements were false and misleading. The truth was that: (i) like other real

estate lenders, iStar faced extraordinary business risks in the collapsing real estate and credit

markets; (ii) the Company was exposed to billions of dollars of losses from non-performing and

defaulting loans acquired from Fremont that would drain cash from the balance sheet and hammer

earnings; (iii) iStar had materially overstated the credit quality of its corporate loan and debt portfolio

and understated credit risk; and (iv) iStar had recorded patently inadequate loan loss reserves given

its exposure to probable loan losses.

- 34 -

102.    Defendants' misleading statements had the intended effect, however, convincing analysts that iStar was uniquely well-positioned to ride out the storms in the real estate and credit markets. For example, Bear Stearns reported on December 11, 2007, that **"Investor Day Adds Clarity"**:

•    **Investor Day**. iStar held its second annual investor day last week. *The presentation sought to distinguish iStar's business model* from other more highly levered companies and structured finance vehicles. *The company also sought to calm concerns regarding the credit quality of the Fremont portfolio, demonstrate its strategic benefits, and address future capital needs*.

103.    Key Banc likewise reported on December 7, 2007, that iStar's balance sheet was strong, that the credit rating agencies under-estimated the quality of iStar's debt portfolio, and that credit quality was strong and iStar's experienced management team was properly focused on controlling credit risk:

*We believe SFI has a strong balance sheet, with more than $15 billion of unencumbered assets, favoring unsecured and secured debt over the collateralized debt obligation model used by many of its peers. The Company worked hard to achieve investment grade status, but must also comply with the agencies more stringent requirements, including lower leverage.* The Company's leverage ratio is 3.25x. SFI anticipates minimal capital raising in 2008 as *its sources of cash closely match its needs next year. SFI appears to be comfortable with the credit quality of its core portfolio. Most of its loans are senior mortgages and the weighted average LTV of the portfolio is 67%.* The corporate tenant lease portfolio is viewed as a long-term stable cash flow business, with properties 96% leased and 11.2 years average remaining lease term; 31% are investment grade credits. *SFI's assets are well-diversified by location and collateral type. The Company maintains a 135-person risk management team, which is well-tenured with extensive resources. Non-performing loans total $428.7 million, or 3% of total assets.*

### THE TRUTH IS REVEALED

104.    Then, on February 28, 2008, iStar issued its fiscal fourth quarter and full year 2007 earnings press release. The press release disclosed that iStar had reported a *loss of $0.62 per share* or $78.7 million for the quarter. This loss stemmed from a $113 million increase in the Company's loan loss provision and a $134.9 write-down of the Company's corporate loan and debt portfolio. These two charges, totaling *a quarter of a billon* dollars, effectively *wiped out close to 90% of the earnings iStar reported from its continuing operations during the first nine months of 2007*.

- 35 -

105.    The Company further reported that during the fourth quarter, its NPLs and Watch List

assets increased by more than 65% and 100%, respectively. According to iStar's earnings release:

> [A]djusted earnings (loss) allocable to common shareholders for the quarter [were] ($36.6) million or ($0.29) per diluted common share. *Included in fourth quarter earnings were $134.9 million of non-cash charges associated with the impairment of two credits that are accounted for as held-to-maturity debt securities in its Corporate Loan and Debt portfolio.* These securities are performing and continue to pay interest. Accounting standards for these securities do not allow for loan loss reserves to be taken on these assets; the standards require that the value be impaired based on a significant drop in market price and on management's current assessment that the decline is other than temporary.

* * *

> *Net income (loss) allocable to common shareholders for the fourth quarter was ($78.7) million, or ($0.62) per diluted common share, compared to $79.2 million, or $0.65 per diluted common share for the fourth quarter 2006. The year-over-year decrease was due to the impact of the non-cash impairment charges and higher provision for loan losses in the fourth quarter.* Please see the financial tables that follow the text of this press release for a detailed reconciliation of adjusted earnings to GAAP net income.

* * *

> *The Company had $217.9 million in loan loss reserves at December 31, 2007 versus $52.2 million at December 31, 2006. During the fourth quarter, the Company recorded $113.0 million in loan loss provision versus $62.0 million in the prior quarter. The $51.0 million quarter-over-quarter increase reflects the continued deterioration in the overall credit markets and its impact on the Company's portfolio as determined in its regular quarterly risk ratings review process.*

106.    That same day, iStar held a conference call with securities analysts to discuss iStar's

fourth quarter results and operations. On the conference call, defendants Sugarman and Rice

discussed the charges and increases in reserves, and despite their best efforts to hedge the bad news,

were forced to admit that nothing in iStar's management team or business model rendered it immune

from the impact of the housing:

Defendant Sugarman:

> First, on the earnings front, our fourth quarter earnings included *two unusual items, $135 million in non-cash impairments in our corporate loan invest portfolio and an increase loan loss provision of approximately $50 million higher than expected.*

- 36 -

* * *

I would say as just a characterization, *the fourth quarter was unusual*.

Defendant Rice:

*Our fourth quarter earnings clearly reflect the impact of the current credit environment on certain of our investments, as well as the continued stress in the overall market.* Our adjusted earnings resulted in a loss this quarter of $36.6 million, or a loss of $0.29 per diluted common share.

Included in the fourth quarter earnings were $135 million of non-cash charges associated with the impairment of two credits in our corporate loan and debt portfolio. Excluding the effect of the impairment for these two credits, adjusted earnings for the fourth quarter were $95.4 million or $0.74 per diluted common share.

Let me provide you with some background on the impairments. *We took a non-cash impairment charge totaling $135 million on two credits, which are accounted for as held to maturity debt securities.* Both credits are performing and continue to pay interest. *The accounting for these securities does not allow loan loss provisions* to be taken against them, *but requires that the value be impaired based on a significant drop in market value for an extended or other than temporary period of time*.

* * *

As we mentioned earlier, *we took a relatively conservative stance based on the continued deterioration of the market and the impact we expect it to have on our portfolio. If the increase from our third quarter to our fourth quarter loan loss provision was also excluded, adjusted earnings per share would have been $4.14, in line with our guidance. However, the market has deteriorated somewhat more than we expected over the last quarter, and we believed it was prudent to increase our loan loss provision accordingly*, or by $51 million more than we originally modeled for the fourth quarter.

* * *

*[T]o the extent assets in that portfolio trade down significantly on a more than temporary basis, we are acquired to take an impairment based on the market trading*. So that group of assets, as we outlined, is only about $423 million. We took an impairment on two of the six assets in that bucket. And I'm sure you're well aware that the corporate debt market is being subjected to some fairly draconian trading levels at this point. I think *at the end of the quarter we felt, although we're still relatively confident in both of these assets that we needed to take this impairment based on the market price*.

- 37 -

107.    The *Associated Press* published an article on February 28, 2008, following the

earnings release, titled, "iStar's Stock Sinks to 7-Year Low," which discussed the damage these

revelations had on iStar's market capitalization and credibility in the capital markets:

> iStar Financial Inc.'s stock sank to its cheapest price in seven years after the
> commercial mortgage investor reported bad credit in its loan portfolio on Thursday.
>
> iStar Financial lost $80.4 million, or 62 cents per share, in the fourth quarter,
> compared with profit of $81.1 million, or 65 cents per share, in the fourth quarter of
> 2006.
>
> *iStar Financial owns a $11 billion portfolio of commercial real estate loans. The*
> *company said the portfolio lost $134.9 million on two loans because of a drop in*
> *the market price for the debt.*
>
> Excluding this charge, profit totaled 74 cents per share. Analysts polled by Thomson
> Financial forecast much higher profit of $1.06 per share.
>
> The company collected $308.1 million in interest payments on its loan portfolio, an
> increase of 91 percent. This was mainly because of $5.4 billion in loans acquired
> when the company bought Fremont Investment & Loan for $1.9 billion.
>
> *iStar's portfolio is suffering from bad credit. About $1.2 billion in loans are not*
> *being repaid right now, compared with $848.7 million at the end of the last*
> *quarter.*
>
> *Deutsche Bank analyst Stephen Laws downgraded iStar to "Hold" from "Buy."*

108.    During the next few days, the price of iStar's common stock continued to fall as

analysts downgraded their opinions of the Company. On February 28, 2008, for example, Credit

Suisse reported:

> **NPLs Increase Across the Board**
>
> iStar Financial reported a 4Q adjusted EPS loss of $0.29, well below am
> estimate ($1.07). Credit losses, both asset impairments and higher
> provisioning, accounted for the lower than expected earnings. Deutsche Bank
> - February 28, 2008
>
> **Downgrading to Hold given non-term risks**
>
> We are downgrading iStar to Hold from Buy, as we are concerned about near-
> term market deterioration resulting in continued elevated loss provisions. We
> believe these elevated loss provisions as well as increasing nonperforming
> loans could result in depressed earnings during the next few quarters.

* * *

Given the expectation of lower near-term earnings, management reduced 2008 adjusted earnings guidance to $3.50 to $4.00 per share from $4.00 to $4.20 per share.

109.    Deutsche Bank similarly reported on February 29, 2008:

**Disappointing 4Q results and 2008 guidance**

*We are reducing our 2008 estimate and price target after disappointing 4Q results*. While we expect book value and the current yield to provide support for shares, our Hold rating reflects our belief that *near-term upside is unlikely given concerns regarding loss provisions and increasing NPLs*. While our new target is $26.50 per share, we believe our Hold rating is appropriate given near- term risks.

**Reducing price target to $26.50 per share from $42 per share**

While our prior target was based on applying a 10x multiple to our 2008 adjusted earnings estimate, our new price target is based on applying a 7x multiple to our new 2009 adjusted earnings estimate. *Given the non-term concerns (loss provisions and NPLs) and reduced visibility for our out year estimate, we believe a 7x multiple is appropriate.* Historically, iStar has traded in a range of 6-13x forward adjusted earnings. While our target represents upside from the recent close price, we believe current risks limit near-term upside warranting a Hold rating.

110.    On March 6, 2008, iStar belatedly announced that defendant Radesca had resigned from his position as iStar's Chief Accounting Officer on February 29, 2008. Smith Barney issued another downgrade of the stock on this news.

111.    Despite analysts' hopes that iStar would bounce back from the poor fourth quarter, the news got markedly worse, as Defendants reluctantly revealed the truth about the Fremont acquisition's devastating effect on iStar's financial health. In the Company's Form 10-K for the year ended December 31, 2007, *the Individual Defendants belatedly admitted that "with the addition of the Fremont portfolio we had material increases in our watch list and non-performing loans."*

112.    iStar's Form 10- K for the year ended December 31, 2007, covered the period that concluded just *ten* business days after the December 14, 2007, Secondary Offering. The 10-K disclosed that iStar had recorded a charge for impairment of the WCI and LNT credits that showed little promise of repayment; that the amount of its NPLs and Watch List assets had increased dramatically; and that iStar had materially increased loan loss reserves largely because of credit risks

- 39 -

acquired with the Fremont portfolio – all facts and circumstances that developed and were apparent

to Defendants before the December 14, 2007 Secondary Offering. The Form 10-K, stated, in

pertinent part:

> *During the fourth quarter, we took a $134.9 million non-cash impairment charge on two of our credits accounted for as held-to-maturity debt securities that have traded* well below our carrying value.
>
> In addition, *based on increased risks in our loan portfolio, including those associated with the Fremont acquired loans, as well as the deterioration in economic and financial conditions; we had provisions for loan losses of $185.0 million during the year, versus $14.0 million in 2006 and $2.3 million in 2005. With the addition of the Fremont portfolio, we had material increases in our watch list and non-performing loans*. Our total loss coverage, defined as the combination of loan loss reserves and the remaining purchase discount on the acquisition, was $384.8 million or 3.6% of total loans, at the end of the year. *The impairments and additional loan loss reserves negatively impacted our return on common book equity and our adjusted return on common book equity this year.*

113.    On April 2, 2008, in an article titled, "A Tale of iStar's Fremont Bet: Sugarman's

High-Risk Story," *The Wall Street Journal* reported that *the Fremont acquisition brought with it*

*"billions of dollars of construction loans and funding commitments to condominium developers,*

*the kind of assets that have higher chances of default in today's housing crisis,"* severely

damaging iStar's credibility in the capital markets:

> When iStar Financial Inc. announced its plan to snap up the commercial real-estate lending business from Fremont General Corp. last spring, the deal was applauded as the latest coup for Jay Sugarman, who over 10 years had built iStar from a start-up into a real-estate financing powerhouse with a solid credit record.
>
> Instead, *the deal has proved toxic, putting a stain on Mr. Sugarman's reputation and a cloud of uncertainty over the company. Most immediately, it burdened iStar with a $1.3 billion bridge loan that comes due June 30 amid the most perilous credit environment in decades. Longer term, the deal loaded iStar with billions of dollars of construction loans and funding commitments to condominium developers, the kind of assets that have higher chances of default in today's housing crisis.*
>
> *iStar's stock has plummeted almost 70% since it closed the Fremont deal in July. With default risk rising, it has been forced to increase its reserves for future loan losses to $185 million at the end of last year from $14 million in 2006.* "It's a high-risk story," said analyst David Fick at Stifel Nicolaus, noting that the biggest

- 40 -

concern is that "they will not get enough money from repayments on its existing loans to meet their funding commitments and service debt."

114.     In the wake of these disclosures, iStar's value declined from over $27 per share to approximately $6 per share.

## THREE ARCHITECTS OF THE MISLEADING SCHEME
## ARE ALLOWED TO RESIGN AND RETIRE

115.     On March 6, 2008, the Board disclosed that defendant Radesca, iStar's Chief Accounting Officer, "resigned" from the Company, effective February 29, 2008, just one day after the truth about iStar's financial condition began to be revealed.

116.     On July 2, 2008, iStar disclosed that the Board had permitted another one of the chief architects of Defendants' misleading public campaign, defendant O'Connor, iStar's longtime Executive Vice President and Chief Operating Officer, to "retire," effective June 30, 2008. This announcement came just four months after the truth about iStar's precarious financial condition was revealed and just six weeks after O'Connor was named as a defendant in the Securities Class Action and alleged to have participated in a scheme to defraud iStar's investors

117.     Defendant Rice retired from the Company on March 6, 2009. According to the Company's proxy, filed with the SEC on April 23, 2010, iStar gave defendant Rice a "special compensation payment" in 2009 of $1 million due to, among other things, "her many years of valuable service as our chief financial officer." The Board granted Rice this special compensation payment despite leading iStar into the teeth of the real estate and credit crisis over-exposed to risky loans and investments and under-reserved. Rice also was responsible for making and approving numerous misleading statements and omissions in iStar's public filings and releases. At the time her special compensation was approved she was a defendant in the Securities Class Action.

118.     Upon information and belief, defendants Radesca and O'Connor were eligible to collect payments and/or other valuable benefits if they "resigned" or "retired," but not if they were terminated "for cause."

- 41 -

119.     The Board's decision to permit defendants Rice, Radesca, and O'Connor to "retire" or "resign" is particularly egregious in view of the federal district court's decision permitting the securities fraud claims against Rice, Radesca, and O'Connor to proceed.

## THE SECURITIES CLASS ACTION

120.     Beginning on April 15, 2008, iStar was named in a series of securities fraud class actions, which have since been consolidated and are pending before this Court.

121.     On March 26, 2010, Judge Sullivan issued an opinion denying in substantial part the defendants' motions to dismiss the Securities Class Action. In his opinion, Judge Sullivan issued a number of findings concerning certain alleged conduct, which also are alleged herein by Plaintiff. Among the findings by Judge Sullivan are that the plaintiffs to the Securities Class Action sufficiently alleged under the heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") that, *inter alia*:

- Defendants omitted from their disclosures that "by the time of the Secondary Offering, iStar had suffered additional losses of $60 million on its held-to-maturity investments";

- Defendants omitted from their disclosures that "by the time of the Secondary Offering, iStar was suffering additional losses in its loan portfolio, such that it would need to record a $1.13 million charge associated with an increase in its loan loss reserves at the end the quarter";

- Defendants omitted from their disclosures that "by the time of the Secondary Offering, the carrying value of iStar's non-performing loans had increased by more than 50%, and the carrying value of its watch list assets had increased by approximately 100%";

- Defendants' following statements were false or misleading: "(1) that iStar's debt was 'extremely well protected,' (2) that the loan portfolio had 'a lot of room for things to go wrong and for us to still be okay,' (3) that the loan portfolio was 'performing pretty much as expected,' and (4) that iStar anticipated 2008 earnings of $4.20 per share"; and

- *Defendants acted with scienter, particularly in view of the allegations that Defendants "monitored the value of [the Company's] portfolio on a nearly real-time basis," that they "needed to conceal iStar's deteriorating performance so that the Company would be able to secure financing and maintain an investment-grade credit rating," and that the "Investors Day conference began with only sixteen business days remaining in the fourth quarter of 2007."*

## THE IMPROPER SHARE REPURCHASE

122.    While iStar's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the share repurchase of over $10 million worth of iStar's shares at an average price of approximately $26.83 per share, which is substantially higher than iStar's current share price of less than $17 per share.  The Board authorized and permitted the buyback in knowing or conscious disregard of the price inflation caused by the Defendants' misleading statements regarding iStar's corporate loan and debt portfolio, loan loss provision, earnings, and business prospects.

## DAMAGES CAUSED BY THE INDIVIDUAL DEFENDANTS

123.    As a result of the Individual Defendants' misconduct, iStar misled investors and shareholders regarding its financial results and business prospects as alleged above.  These improper statements have devastated iStar's credibility in the capital markets, as reflected by the Company's $3.2 billion loss in market capitalization.

124.    As a direct and proximate result of the Individual Defendants' action, iStar has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending iStar and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred in the repurchase of $10 million worth of shares at artificially inflated prices;

(c)    increased costs of capital following from the loss in investor confidence in iStar's fundamentals and in the veracity of information provided in its offering prospectuses; and

(d)    costs incurred in compensating and paying benefits to the Individual Defendants who breached their fiduciary duties to iStar and damaged the Company.

125.    Defendants' actions have irreparably damaged iStar's corporate image and goodwill. For at least the foreseeable future, iStar stock will be discounted by an investing public concerned

about iStar's faithless fiduciaries and willingness to mislead the investing public. iStar's ability to raise equity capital or debt on favorable terms has been and will for the foreseeable future be impaired.

## DERIVATIVE ALLEGATIONS

126.    Plaintiff brings this action derivatively in the right and for the benefit of iStar to redress injuries suffered by iStar as a direct result of the breaches of fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. iStar is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127.    Plaintiff will adequately and fairly represent the interests of iStar in enforcing and prosecuting its rights.

128.    Plaintiff is an iStar shareholder and Plaintiff has continuously owned iStar stock since May 31, 2001.

129.    Plaintiff has made a demand upon the Board to investigate and remedy the violations of law described herein as required by Federal Rule of Civil Procedure Rule 23.1 and Maryland law. As set forth below, the Board has wrongfully ignored and refused Plaintiff's demand. The Board and its special committee's wrongful decision to ignore and refuse Plaintiff's demand was unfounded in law, and was not made independently, on the basis of a good faith and reasonable investigation of the claims made in Plaintiff's demand. The Board and its designated special committee breached their fiduciary duty to inform themselves of all material information reasonably available before determining to ignore and refuse Plaintiff's demand, and their decision was not in the best interests of iStar. The Board's decision is not entitled to the protection of the business judgment rule.

130.    On June 1, 2009, Plaintiff made a litigation demand on iStar's Board to "immediately take appropriate action to commence an independent investigation" and "to recover for the Company, by litigation if necessary, damages proximately caused by the officers and directors' breaches of the fiduciary duties of loyalty, good faith, and due care" (the "Demand"). The Demand outlined evidence of gross mismanagement, specified false and misleading statements and the reasons for their falsity

- 44 -

(several of which Judge Sullivan found sufficient to support a claim for violations of the federal securities laws under the heightened pleading standards of the PSLRA), and described the injuries caused to iStar. A true and correct copy of the Demand is attached to this complaint as Exhibit A.

131.    On June 15, 2009, iStar's corporate general counsel and secretary, Geoffrey Dugan, sent a letter to Plaintiff's counsel stating that "the Board has met to consider the issues raised in" the Demand. Mr. Dugan represented that "the Board has taken the matters raised in the Demand Letter under advisement and has resolved to conduct a reasonable and good faith investigation of the facts and circumstances surrounding the matters described in the Demand Letter[,]" and "will communicate further with [plaintiff] upon completion of the investigation." A true and correct copy of Mr. Dugan's June 15, 2009, letter is attached to this complaint as Exhibit B. iStar's Board has failed to fulfill any of these commitments.

132.    On June 26, 2009, Plaintiff's counsel wrote to Mr. Dugan seeking additional information about the Board's purported investigation of the matters raised in the Demand. Specifically, Plaintiff sought the following information:

> 1.    Has the Board delegated the investigation to a sub-committee of the Board or to some other *ad hoc* group of officers and/or directors (hereinafter, "sub-committee")? If so, who are the members of that sub-committee, and how and why were the members of the sub-committee selected?
>
> 2.    How will the investigation and the sub-committee's proceedings, deliberations, decisions, and/or recommendations be recorded and documented? Is the sub-committee required to issue a formal written report detailing the findings of the investigation?
>
> 3.    Has the Board set a deadline or established some other form of schedule or timeframe within which the inquiry is to be conducted?
>
> 4.    If the Board had adopted an authorizing resolution that contains the answers to some or all of these questions, we respectfully request that you provide Ms. Vancil with a copy of that resolution.

The Board has refused to provide any of the requested information, despite Plaintiff's repeated requests over a period of several months, on grounds that Plaintiff has not provided "proof" of her standing to bring a derivative action.

133.    On July 10, 2009, counsel purporting to represent a special committee of the Board wrote to Plaintiff's counsel and stated that the special committee would review the matters raised in the Demand. Through its counsel, however, the special committee asserted that "*[t]he predicate for [the Demand] is that you have a plaintiff who is entitled to make the demand* your letter constitutes. Accordingly, the committee needs to know whether your plaintiff is, and at all relevant times, has been a shareholder of iStar .... *If your client has standing, her demand will receive a fair, dispassionate, and reasoned response after appropriate analysis.*" The special committee then demanded not just "proof" of Plaintiff's standing to maintain a derivative lawsuit, but other information, some of it personal, that is unrelated to demonstrating a shareholder's standing to bring a derivative lawsuit, including "the full name, residential and, if applicable, business address of your client, Ms. Addie Vancil;" "brokerage statements, or the equivalent thereof, showing the name of the brokerage firm through which she allegedly purchased iStar shares;" and "the address of the brokerage firm office which oversaw and oversees her account." A true and correct copy of the special committee's counsel's July 10, 2009, letter is attached to this complaint as Exhibit C. Neither the Board nor the special committee has ever provided a substantive response of any kind reflecting any form of substantive analysis of the issues raised and claims made in the Demand.

134.    Through her counsel, Plaintiff responded to the special committee by letter dated July 16, 2009. Plaintiff pointed out that Delaware law, to which Maryland courts often refer on questions of corporate law not specifically addressed by Maryland's appellate courts, rejects the notion that a shareholder must demonstrate an "entitlement" to make a demand, let alone "standing" to bring a derivative lawsuit on the Company's behalf. The Board's duty upon receiving a litigation demand is independent of any demonstrated "entitlement" by the shareholder making the demand, let alone submission of "proof" of standing. *Schick Incorporated v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235 (Del. Ch. 1987). Plaintiff invited the special committee to provide legal authority to the contrary; to date, none has been provided. Plaintiff also pointed out that much of the information the special committee requested is neither related to her status as an iStar shareholder nor necessary to demonstrate standing to sue derivatively. Plaintiff offered nevertheless

- 46 -

to provide documentation demonstrating that she is an iStar shareholder. Plaintiff also repeated her request for information about the special committee's purported investigation of the matters raised by the Demand. A true and correct copy of Plaintiff's July 16, 2009 letter is attached to this complaint as Exhibit D.

135.    Through its counsel, the special committee responded to Plaintiff's July 16 letter by questioning her counsel's candor and motives, citing Plaintiff's age, and insisting on "enough information so that I can test Ms. Vancil's share ownership." A true and correct copy of the special committee's counsel's July 22, 2009 letter is attached hereto as Exhibit E.    Plaintiff's counsel responded by letter dated July 23, 2009.    Plaintiff asked counsel to confirm whether the special committee would commence an investigation in response to the Demand, and enclosed an on-line brokerage statement from Fidelity Investments dated July 13, 2009, showing that Plaintiff held 1,000 shares of iStar stock.    The account number and information regarding Plaintiff's other investments was redacted. A true and correct copy of this letter and the attachment are attached hereto as Exhibit F.

136.    The special committee responded through its counsel on July 27, 2009, and refused to accept the account statement as "evidence" that Plaintiff is a shareholder because the copy of the statement provided did not show Ms. Vancil's last name (it showed her first name, "Addie") and redacted unrelated information regarding other investments. The special committee also continued to demand proof of Plaintiff's standing to sue derivatively. A true and correct copy of the special committee's July 27, 2009 letter is attached hereto as Exhibit G.  Plaintiff responded by letter dated August 7, 2009, noting that only unrelated investment information had been redacted from her on-line Fidelity statement, and that she was, at that time, a shareholder who had made a demand, not a plaintiff in a derivative lawsuit.  Plaintiff's shareholder demand triggered the Board's obligation to investigate and make a determination as to whether to pursue the claims in her demand, regardless of whether she had standing to sue derivatively. The question of whether Plaintiff might have standing to sue derivatively was utterly irrelevant to the Board's duty to inform itself of all material facts reasonably available regarding the Demand's claims, and to make an independent, reasonably

- 47 -

informed and good faith determination about whether pursuing some or all of the claims would be in iStar's best interests. Plaintiff had not yet determined whether to file a derivative lawsuit challenging the Board's decision on the Demand because it was not clear whether the Board would pursue the claims or refuse the Demand, and she was not in a position to evaluate the Board's response. Had the Board elected to pursue the claims or had Plaintiff been satisfied that the Board's decision to refuse the Demand was well-founded, the question of her standing to sue would have been moot. A true and correct copy of Plaintiff's August 7, 2009 letter is attached hereto as Exhibit H.

137.     On August 10, 2009, the special committee, through its counsel, suggested that the parties' correspondence cease because Plaintiff has not shown that she "owned any iStar shares at the time of the alleged wrongs" described in the Demand (*i.e.*, that she had standing to sue derivatively). A true and correct copy of the special committee's August 10, 2009 letter is attached hereto as Exhibit I. Plaintiff responded through her counsel by letter dated September 2, 2009, a true and correct copy of which is attached hereto as Exhibit J. Plaintiff enclosed a copy of a hardcopy Fidelity Private Client group brokerage statement for the month of July 2009 showing that she owned 1,000 shares of iStar stock. Plaintiff told the special committee once again that a shareholder's declination to provide proof of standing to sue derivatively is not a proper basis on which to refuse a demand, and asked again for the special committee to provide legal authority that might support its position. Plaintiff also sought clarification as to whether or not the special committee had, in fact, determined to refuse the Demand on that basis.

138.     The special committee responded through its counsel on September 9, 2009. The special committee once again suggested that the parties cease their correspondence because Plaintiff had not provided proof that she held shares continuously from the time of the wrongs alleged through the present, and so had not demonstrated her standing to sue derivatively. This time, however, the special committee purported to rely on the *Schick* opinion provided by Plaintiff in earlier correspondence. The special committee backhandedly referred to Plaintiff as a "busybody" who may make a demand but to whom no response was owed and whose demand the Board may ignore in the absence of proof of her standing to sue. The special committee stated that a demand merely "serves a

- 48 -

notice function," that the Securities Class Action had provided the Board with "notice" of Plaintiff's "'grievances'" before the Board received the Demand, and that the Demand was nothing more than "redundant" notice. Most troublingly, the special committee asserted that iStar's "engage[ment] of very competent counsel to address" the Securities Class Action was somehow a sufficient and appropriate response to the "notice" of the issues underlying the Securities Class Action and the Demand. A true and correct copy of the special committee's September 9, 2009, letter is attached hereto as Exhibit K.

139.    By letter dated November 6, 2009, Plaintiff's counsel responded, citing controlling Maryland authority to the effect that, "[o]nce a demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation." *Bender v. Schwartz*, 917 A.2d 142, 152 (Md. App. 2007). Plaintiff pointed out that in light of this unambiguous duty under Maryland law to investigate and respond to the Demand, "the engagement of counsel to defend iStar and the individual officers and directors named defendants in the securities class action" is not evidence that the committee fulfilled its duties under the business judgment rule to conduct independently a good faith and reasonable inquiry into the claims made in the Demand. Plaintiff told the special committee in no uncertain terms that, '[b]y her demand, [she] seeks, among other things, to hold certain iStar fiduciaries responsible for exposing iStar to liability for securities fraud, including the very corporate fiduciaries that defense counsel in the securities class action represent." In order to avoid any possibility of confusion, Plaintiff asked again for a "clear and plain statement" of the special committee's and the Board's decision with respect to the Demand:

> Is it the Board's position that it will not investigate and substantively respond to the issues raised in Ms. Vancil's demand unless and until she proves to your satisfaction that she owned iStar Financial shares at the time of the alleged wrongdoing and has owned iStar shares continuously since then? This is a simple question to which we would appreciate a clear and direct answer. If there is some other basis for what appears to be a decision by the Board to refuse Ms. Vancil's demand without an investigation and report, please provide a clear and complete statement of those grounds. We seek this clarification to avoid potentially costly misunderstandings.

A true and correct copy of Plaintiff's November 6, 2009, letter is attached hereto as Exhibit L.

140.     On November 23, 2009, the special committee responded through its counsel, telling Plaintiff, "[w]e are, regrettably, at an impasse. ... [Y]ou still will not provide proof of your client's continuous ownership of iStar stock, which you do not dispute is the prerequisite for bringing a shareholder derivative suit." Ignoring Plaintiff's citation to Maryland precedent, the special committee asserted that Plaintiff relied on the *Schick* opinion "to support your contention that the iStar Board of Directors is obligated to investigate Ms. Vancil's demand, despite your unwillingness to provide proof that she would have standing to sue on the company's behalf[,]" and repeated its position that demand is a form of notice and that a Board may "'ignore the demand ... if, in the exercise of its good faith judgment, the circumstances indicate that the corporation's interests would be served thereby.'" *Schick*, 533 A.2d at 1240. The only circumstances cited by the special committee as justifying its determination to ignore and refuse the Demand were Plaintiff's refusal to provide proof that she had standing to sue derivatively and iStar's retention of "very competent counsel" to represent the Company and its officers and directors in the Securities Class Action. According to the special committee, because Plaintiff had declined to prove her standing to sue, "iStar need not provide any response other than the one it has now given you no fewer than three times." A true and correct copy the special committee's November 23, 2009, letter is attached hereto as Exhibit M.

141.     No legal action has been filed by iStar against any of the Individual Defendants. Two of the primary architects of the campaign of misleading statements have been allowed to resign and retire, rather than being terminated for cause. After the true state of iStar's dreadful financial condition was disclosed over the course of 2008, the Compensation Committee recommended and the Board approved substantial salaries, cash bonuses and stock awards for the officers primarily responsible for the misleading statements and the directors bearing primary responsibility for ensuring the accuracy and truthfulness of iStar's public filings and statement and guidance to analysts, ratings agencies, and shareholders.

142.     The Board and its special committee's decision to ignore and refuse the Demand was not within the ambit of the business judgment rule. The decision had no basis in law, was not based

upon a reasonable investigation conducted in good faith, and is plainly not in the best interests of iStar. Moreover, the Board and special committee did not act independently with respect to the decision or with due care.

(a) The several months of correspondence between Plaintiff and the special committee appointed to consider Plaintiff's Demand betrays the special committee's failure to act independently with respect to the Demand. Rather than address the weighty issues raised in the Demand, throughout the process, the special committee sought reasons not to undertake an objective, reasonable, and good faith investigation and to refuse the demand. The special committee continued to dispute Plaintiff's status as a shareholder even after documentation was provided addressing their stated concerns. As a precondition to considering the Demand, the special committee demanded information wholly unrelated to the Demand, and even going so far as to require information unrelated to Plaintiff's standing to sue derivatively. Prejudging the question of whether a derivative lawsuit might ensue challenging the Board's decision to refuse the Demand, the special committee tried to justify its insistence on a demonstration of standing to sue by casting aspersions on Plaintiff's counsel. The special committee backhandedly referred to Plaintiff as a "busybody" not entitled to the courtesy of a response to her inquiries, based on her refusal prematurely to address the question of her standing to bring a derivative lawsuit before there was any reason to believe that a derivative lawsuit might be necessary to prosecute iStar's claims. The special committee dismissed the Demand as merely "redundant notice" of the claims made the in the Securities Class Action.

(b) From the beginning, the special committee took the wholly unfounded position that "*[t]he predicate for [the Demand] is that you have a plaintiff who is entitled to make the demand,*" and conditioned acting on her demand upon proof to the satisfaction of the special committee that she had standing to sue derivatively: "*If your client has standing, her demand will receive a fair, dispassionate, and reasoned response after appropriate analysis.*" The special committee did not change its position even after being provided with authority demonstrating that there is no "entitlement" predicate to making a shareholder demand and no standing precondition to

- 51 -

the Board's duty to conduct an objective, reasonable, and good faith investigation and respond to a shareholder demand.

(c) The position that proof of standing is a precondition to conducting a reasonable investigation in good faith and responding to the Demand reflects the Board and its special committee's determination not to act independently, in good faith and on the basis of all material information reasonably available. Conditioning these duties on Plaintiffs demonstration that she was in a position to pursue derivative litigation against the Board amply demonstrates that the Board and its special committee did not act independently or in good faith based upon an objective evaluation of whether pursuing the claims in the Demand would be in the Company's best interests. Had the Board elected to pursue the claims or had Plaintiff been satisfied that the Board's decision to refuse the Demand was well-founded, the question of standing to sue would have been moot. Standing would only be relevant in the event that the Board had determined to refuse the Demand. The Board's decision to insist on a demonstration of standing at the outset shows that the Board and its committee prejudged the issue without any meaningful evaluation and based their decision on superfluous facts.

(d) Having baselessly dismissed the Demand as mere "redundant notice" of claims made in the Securities Class Action, the Board and its special committee left the matter to the "very competent counsel" it had hired to defend officers and directors targeted by the Demand in the Securities Class Action. Any reliance on the investigation or advice of lawyers ethically and legally bound by a duty of undivided loyalty to those individual defendants in the Securities Class Action who are targets of the Demand is completely at odds with the Board's and its special committee's duties in considering the Demand independently, objectively, reasonably and in good faith.

143. The Board's decision to ignore and refuse the Demand was contrary to iStar's best interests. Defendants breached their fiduciary duties to iStar and caused or permitted the Company to violate federal securities laws, exposing iStar to tens and possibly hundreds of millions of dollars in damages and irreparably damaging iStar's credibility in the capital markets. The claims of the Demand are well-founded, valuable, and iStar's only hope of recovery.

- 52 -

144.    Accordingly, Plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

145.    Plaintiff has not made any demand on the other shareholders of iStar to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    iStar is a publicly held company with over 93 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The Individual Defendants owed and owe iStar fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe iStar the highest obligation of good faith, fair dealing, loyalty and due care.

148.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

149.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company, failed to ensure that iStar disseminated accurate, truthful and complete information to its shareholders, and authorized and permitted the purchase at a time when the Company's stock was artificially inflated. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.    In addition, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure the Company's financial statements were prepared in accordance

with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

151. In utter and complete disregard for their fiduciary duties, the Individual Defendants willfully ignored the obvious and pervasive problems with iStar's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

152. Furthermore, the Individual Defendants all are required to act with the utmost loyalty and good faith to the Company. In spite of these duties, Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber allowed defendants Rice and Radesca to "resign" and O'Connor to "retire" despite having grounds to terminate them for cause.

153. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, iStar has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Against All Defendants for Waste of Corporate Assets

154. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155. As a result of the misconduct described above, the Individual Defendant wasted corporate assets: (i) by failing to properly consider the interests of the Company and its public shareholders; (ii) by failing to conduct proper supervision; (iii) by paying bonuses to certain of its executive officers; (iv) by spending over $10 million to repurchase the Company's stock at artificially inflated prices; and (v) by incurring potentially tens of millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

156. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157. Plaintiff, on behalf of iStar, has no adequate remedy at law.

- 54 -

## THIRD CAUSE OF ACTION

### Against Defendants Sugarman, O'Connor, Radesca, and Rice for Indemnification and Contribution

158.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

159.   The conduct of defendants Sugarman, O'Connor, Radesca, and Rice described above has exposed iStar to significant liability under various federal and state laws by their disloyal acts.

160.   iStar is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

161.   Defendants Sugarman, O'Connor, Radesca, and Rice have caused iStar to suffer substantial harm through their disloyal acts.

162.   iStar is entitled to contribution and indemnification from defendants Sugarman, O'Connor, Radesca, and Rice in connection with all such claims that have been, are, or may be asserted against iStar by virtue of their wrongdoing.

## FOURTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

163.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of iStar.

165.   Plaintiff, as a shareholder and representative of iStar, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      Directing iStar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect iStar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and public disclosures;

2.      A proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.      a provision to permit the shareholders of iStar to nominate at least three candidates for election to the Board;

4.      a proposal to strengthen the qualifications of iStar's directors, executives and other employees;

5.      a proposal to ensure that iStar prudently expends funds in future stock repurchase programs on the basis of all material information reasonably available;

6.      a proposal to appropriately test and then strengthen iStar's internal audit and control functions; and

7.      a proposal to strengthen and improve the Board's procedures for evaluating and responding to shareholder litigation and inspection demands.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets so as to assure that Plaintiff on behalf of iStar has an effective remedy;

- 56 -

D.      Awarding to iStar restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 28, 2010

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON (TGA-1515)

250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile:  (212) 810-2427

ROBBINS UMEDA, LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
KELLY M. MCINTYRE
600 West B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

490709

# Exhibit A

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
MARK A. GOLOVACH
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

June 1, 2009

**VIA CERTIFIED U. S. MAIL**

iStar Financial Inc.
Board of Directors
c/o Jay Sugarman
Chairman of the Board
1114 Avenue of the Americas
39th Floor
New York, NY 10036

  **Re:**   *Shareholder Demand Letter*

Dear Board of Directors:

   Our Firm has been retained to represent Addie Vancil, a shareholder of iStar Financial, Inc. ("iStar" or the "Company"), in connection with breaches of fiduciary duty by members of iStar's Board of Directors (the "Board") and certain of the Company's current and former executive officers. Specifically, Ms. Vancil is concerned that certain officers and directors (i) published misleading statements and made material omissions regarding iStar's exposure to and financial damage resulting from the collapsing commercial real estate and credit markets from July 2, 2007 to March 6, 2008 (the "Relevant Period"), and (ii) defrauded iStar and wasted its assets by repurchasing $10 million of iStar stock at prices that iStar's officers and directors knew were artificially inflated by these misleading statements. Demand is hereby made on behalf of Ms. Vancil that the Board immediately take appropriate action to commence an independent investigation of these matters, and to recover for the Company, by litigation if necessary, damages proximately caused by the officers and directors' breaches of the fiduciary duties of loyalty, good faith, and due care, as set forth below. Ms. Vancil also demands that the Board implement corporate governance reforms to prevent the recurrence of the acts complained of herein.

*Shareholder Demand Letter*
June 1, 2009
Page 2

## The Commercial Real Estate and Credit Market Collapse

The collapse of the market for commercial real estate that began in 2006 and accelerated through 2007 was amplified by the meltdown of the primary and secondary markets for real estate backed debt. Increasing skepticism about the ability of borrowers to service loans and the quality of collateral securing loans and mortgage-backed securities combined with reduced expected rates of return on real property to reduce substantially the value of the mortgage loans that iStar carried on its books over the course of 2007. During this period, the number of non-performing loans, delinquent loans, and loans in foreclosure in iStar's loan portfolio increased significantly, and the market and enterprise risks associated with mortgage lending increased correspondingly.

Under these circumstances, iStar's officers and directors should have closely examined iStar's corporate debt, loan portfolio risk, and current and expected loan losses to ensure that its financial reports and public statements regarding its financial condition and future business prospects accurately reflected iStar's substantial exposure to the rapidly degenerating commercial real estate and credit markets. The officers and directors had a duty to keep iStar's shareholders fully and fairly informed about the current and expected impact of these deteriorating conditions on iStar's financial performance. Unfortunately for iStar and its shareholders, the Company's officers and directors failed to respond appropriately to these challenges or to communicate properly with shareholders.

When these fiduciaries caused iStar to take on substantial new exposure to these market risks by acquiring nearly $2 billion of Fremont General Corporation's ("Fremont ") commercial mortgage portfolio, iStar's fiduciaries were obligated to explain those risks and their material negative impact on iStar's overall risk profile. iStar's officers and directors failed to meet the demands of duty. They have exposed the Company to substantial risk of liability for securities fraud and severely damaged the Company's credibility in the financial markets, increasing iStar's cost of capital in the midst of a credit crisis in which access to capital and costs of capital are paramount.

## The Fiduciaries' Failure Properly to Disclose Risks Arising out of the Fremont General Acquisition

In July 2007, iStar acquired $1.9 billion worth of Fremont's commercial-mortgage portfolio. To finance the Fremont acquisition, iStar obtained a $1.3 billion bridge loan that was scheduled to mature in June 2008. In addition, iStar agreed to fund up to $4.4 billion of unfunded loan commitments in Fremont's portfolio. The Fremont acquisition proved disastrous. Huge percentages of the billions of dollars of construction loans to condominium developers included in the deal became non-performing, delinquent or defaulting loans. The officers and directors caused or allowed the Company improperly to conceal the disastrous impact that the Fremont acquisition would have and later did have on the Company's financial performance.

On or about May 1, 2007, iStar filed a registration statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC") on Form S-3. The Registration Statement offered to sell, over time, a multitude of securities (the "Secondary

*Shareholder Demand Letter*
June 1, 2009
Page 3

Offering"). This Secondary Offering was considered a "shelf registration," pursuant to which the Company was permitted to register securities for sale until it determined to conduct an offering, provided, however, that the Registration Statement met all the requirements prescribed under applicable securities regulations, including that the information contained therein be kept current.

Specifically, an issuer utilizing Form S-3 is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The issuer also is required to update the information in its periodic filings, including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations." *See* Item 303(a) of Regulation S-K. The issuer further must disclose "any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year ...." *See* Instruction 11 (a) of Form S-3.

On or about October 9, 2007, iStar filed a prospectus (the "Prospectus") that formed part of the Registration Statement for the Secondary Offering. On or about December 13, 2007, iStar filed a preliminary prospectus supplement (the "Preliminary Prospectus Supplement"), offering six million common shares to the public. On or about December 14, 2007, the Registration Statement became effective. Then, on or about December 17, 2007, iStar filed a prospectus supplement (the "Prospectus Supplement," and together with the Preliminary Prospectus Supplement, the "Prospectus Supplements") to increase the number of common shares offered to the public from six million to eight million shares. On or about December 19, 2007, iStar sold eight million shares to the public at $28.41 per share. The Prospectus Supplements represented that the Company intended to use the proceeds from the Secondary Offering to pay down an existing short-term financing arrangement that the Company had used to acquire Fremont.

The Registration Statement, which incorporated the Prospectus and the Prospectus Supplements (hereinafter collectively, the "Registration Statement Materials"), contained numerous untrue statements of material fact and omitted material information that was required to be disclosed under the regulations governing its preparation. The Registration Statement Materials failed to disclose several material negative changes to iStar's continuing operations and financial performance that should have been disclosed. These required disclosures included, among other facts, the Company's: (i) material decline in debt security values; (ii) material decline in credit quality; and (iii) material increase in loan losses.

### Declining Debt Security Values

When the Registration Statement became effective on December 14, 2007, the amount of the unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million – a nearly 100% increase since the end of iStar's third quarter. These losses were material, representing more than twenty percent of income from continuing operations reported during the first nine months of 2007.

This fact was not disclosed at the time the Registration Statement became effective or in the Registration Statement Materials. The Registration Statement Materials also failed to disclose that the price of two major debt securities held by iStar declined by approximately 50%

Shareholder Demand Letter
June 1, 2009
Page 4

in value from early 2007 through the date of the Secondary Offering. This loss in value had an immediate material impact on iStar's operating income because the Company had to take a $134.9 million expense in the fourth quarter of 2007. These facts would have been material to investors in the Secondary Offering and should have been disclosed in the Registration Statement Materials.

### Material Decline in Credit Quality

The Registration Statement Materials also failed to alert investors to the fact that iStar experienced a material increase in the amount of non-performing loans ("NPL") and "watch list" assets in its loan portfolio. By December 2007, the carrying value of loans classified as non-performing had increased by more than 50% since September 30, 2007, and the carrying value of loans placed on iStar's "watch list" increased by 103% from $610.5 million to $1,240.2 million since September 30, 2007. This information would have been material to investors in the Secondary Offering and should have been disclosed in the Registration Statement Materials.

### Material Increases in Loan Losses

Losses in iStar's loan portfolio increased dramatically between September 30, 2007 and the date of the Secondary Offering. During the *first nine months* of 2007, iStar recorded a $72 million charge against earnings for loan losses. During the *last three months* of 2007, iStar recorded a $113 million charge to increase loan loss reserves -- a material deterioration in value that the officers and directors knew about and should have been disclosed to shareholders and investors. The officers and directors knew that the Company's loan portfolio had experienced a material decline in credit quality and carrying value between September 30, 2007 and December 14, 2007, when the Registration Statement became effective, and yet the Registration Statement Materials were not supplemented or amended to disclose these facts.

There is no excuse for the officers and directors' failure to ensure that this information was disclosed. iStar's Chief Operating Officer ("COO"), Timothy J. O'Connor ("O'Connor"), stated during the Company's December 6, 2007 Investor Day Conference (the "Investors Day Conference") that iStar's management monitored the Company's portfolio to "understand what's going on in our portfolio *on a real-time basis*." The $113 million increase in iStar's loan loss reserves would have been material to investors in the Secondary Offering and should have been disclosed in the Registration Statement Materials.

### Misleading Statements at the Investors Day Conference

iStar's officers and directors made several misleading statements to shareholders, potential investors, and analysts at the Investors Day Conference regarding iStar's risk profile. The thrust of these statements was that iStar somehow faced fewer risks than other mortgage lenders in the real estate and credit market corrections because iStar conservatively valued and closely monitored iStar's loan portfolio.

For example, O'Connor stated, "We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can

June 1, 2009
Page 5

actually understand what's going on in our portfolio on a real-time basis ... [a]nd what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values...." Further, Jay Sugarman ("Sugarman"), iStar's Chief Executive Officer ("CEO") and Chairman of the Board, stated, "And I point this out simply to start the meeting by saying the strength of our balance sheet has always been one of the strongholds of the iStar story" and "our debt is extremely well protected ... I think it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year.... And we think it's a fundamentally different business, it's a different underwriting and it's so much more safe and so much more secure that these ratings are very misleading."

In discussing the Company's non-performing loans portfolio and high risk loans, iStar's officers represented that iStar's management understood the Company's loan portfolio, maintained adequate loan loss reserves, and took a conservative approach to loan loss reserves.

For example, O'Connor stated, "[W]e as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they become real problems.... Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected.... And again, from our perspective, no surprises here, no surprises, and I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to."

O'Connor also stated, "[W]e do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists. ... [A]nd then if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves.... We've grown that number. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio. So if you step back and look at it, we have available to us as kind of a bucket to address these issues ... [i]t's a lot of money to address issues in the portfolio.... We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion. In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business."

These statements were false and misleading. The truth was that: (i) like other real estate lenders, iStar faced significant business risks in the collapsing real estate and credit markets; (ii) the Company was exposed to billions of dollars of losses from non-performing and defaulting loans acquired from Fremont; (iii) iStar had overstated the value of its corporate loan and debt portfolio; and (iv) iStar had recorded patently inadequate loan loss resources given its exposure.

## The Fraudulent Stock Repurchase

During the fourth quarter 2007, while this misinformation artificially inflated iStar's stock price, iStar's officers and directors caused the Company to repurchase 400,000 shares of iStar stock in the open market at an average price of $26.83 per share, for a total cost to the Company of $10.7 million. The officers and directors knew that these prices were artificially inflated by their materially misleading statements and omissions, and defrauded iStar and wasted its assets. The repurchase took place during a quarter in which iStar recorded a net loss of $69.8 million, and cannot have reflected the Board's fully informed and considered determination that iStar stock was the best possible investment of iStar's scarce cash resources.

Just a few months later, on February 28, 2008, iStar was forced to disclose a $134.9 million write-down of its corporate loan and debt portfolio and a $113 million increase to its loan loss provisions in its fourth quarter earnings press release. As noted, the write-down and loan loss provision increase contributed to a $69.8 million loss for the fourth quarter 2007. In the wake of these disastrous disclosures, iStar's stock price has declined from over $27 per share to less than $3 per share – a $3.2 billion market capitalization loss.

### Exposure to Liability for Securities Fraud

The officers and directors' misconduct has exposed iStar to the risk of substantial liability and defense costs in connection with a securities fraud class action filed against iStar in the United States District Court for the Southern District of New York on February 2, 2009 (the "Class Action"). The plaintiffs in the Class Action allege that iStar and certain officers and directors violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by publishing false and misleading statements in the Registration Statement Materials, and are therefore liable to a class of investors who purchased iStar common stock.

### Damages

As a direct and proximate result of the Board and officers and directors' actions, iStar has incurred and will continue to incur significant expenses and damages, including, but not limited to: (i) the costs incurred in investigating and defending iStar and certain officers and directors in the Class Action; (ii) the costs of settling or to satisfying an adverse judgment in the Class Action; (iii) the excess amounts paid for the 400,000 shares repurchased at artificially inflated prices; (iv) the increased costs of raising capital as a result of the loss in investor confidence in iStar's public filings; and (v) the costs of compensating and paying for benefits for officers and directors who have breached their duties to iStar.

Accordingly, Ms. Vancil demands that the Board immediately commence an independent investigation of the matters set forth herein, led by independent counsel and supervised by independent and disinterested directors. Ms. Vancil further demands that the Company make demand upon and, if necessary, commence legal proceedings forthwith against the officers and directors to recover damages from, and compensation, benefits and bonuses paid to, any iStar officer and/or director determined to be involved in the wrongdoing set forth above, including, at a minimum, CEO and Chairman of the Board, Sugarman; COO and Executive Vice President,

O'Connor; Chief Accounting Officer, Nicholas A. Radesca; Chief Financial Officer, Catherine D. Rice; Lead Director, Chairman of the Compensation Committee and member of the Audit Committee, Robin Josephs; director, Glenn R. August; director and Audit Committee member, Robert W. Holman, Jr.; director and Compensation Committee member, John G. McDonald; director and Audit Committee member, George R. Puskar; and director and member, Jeffrey A. Weber for: (i) causing the Company to publish misleading statements and financial reports; (ii) causing the Company to repurchase $10 million worth of shares at artificially inflated prices; (iii) severely damaging iStar's credibility in the capital markets; and (iv) failing to comply with their fiduciary oversight obligation by, among other things, permitting the above-described misconduct and allowing the culpable officers and directors to remain at the Company and/or on the Board.

Ms. Vancil further demands that the Board implement corporate governance reforms to prevent the recurrence of the acts complained of in this demand letter.

None of the officers and directors named in this letter should be involved in conducting, overseeing or making decisions about the investigation or litigation, since each lacks the requisite independence and disinterestedness.

We will appreciate a written statement of your intentions. If we are not advised within 21 days of the date of this demand that appropriate action is being taken, then we will take such further action on behalf of the Company as Ms. Vancil considers appropriate.

Ms. Vancil thanks you for your prompt attention to this serious matter. Please do not hesitate to contact me directly to discuss this matter.

Very truly yours,

CRAIG W. SMITH

BJR/klc

cc Addie Vancil

397098

# Exhibit B



**STAR** | FINANCIAL
Return on Ideas™

June 15, 2009

Craig W. Smith
Robbins Umeda LLP
610 West Ash Street
Suite 1800
San Diego, CA 92101

**Re:** *June 1, 2009 Shareholder Demand Letter to iStar Financial Inc.*

Dear Mr. Smith:

I am writing on behalf of the Board of Directors of iStar Financial Inc. ("iStar") to advise you that the Board has met to consider the issues raised in your letter dated June 1, 2009, sent on behalf of Ms. Addie Vancil, a purported shareholder of iStar (the "Demand Letter"). The iStar Board has taken the matters raised in the Demand Letter under advisement and has resolved to conduct a reasonable and good faith investigation of the facts and circumstances surrounding the matters described in the Demand Letter. We will communicate further with you upon completion of the investigation.

Very truly yours,

Geoffrey M. Dugan
General Counsel, Corporate and Secretary

# Exhibit C

WILMERHALE

July 10, 2009

Jeffrey B. Rudman

## *VIA EMAIL AND FIRST CLASS MAIL*

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

Craig W. Smith, Esq.
Robbins Umeda LLP
610 Ash Street, Suite 1800
San Diego, CA 92101

      **Re:**    ***Shareholder Demand Letter Response***

Dear Craig:

Thank you for your time and courtesy on the telephone yesterday.

As you know, this firm represents a special committee of the iStar Financial Inc. ("iStar") board. This committee will carefully review the matters raised by you in your letter of June 1, 2009.

The predicate for your letter is that you have a plaintiff who is entitled to make the demand your letter constitutes. Accordingly, the committee needs to know whether your plaintiff is, and at all relevant times, has been a shareholder of iStar. To resolve that issue, we request that you provide us with the following information:

1.     the full name, residential and, if applicable, business address of your client, Ms. Addie Vancil;

2.     brokerage statements, or the equivalent thereof, showing the name of the brokerage firm through which she allegedly purchased iStar shares;

3.     the address of the brokerage firm office which oversaw and oversees her account;

4.     brokerage statements showing the date(s) of the purchase(s) of her shares, and a current brokerage statement showing that she still owns these shares.

I look forward to working with you. If your client has standing, her demand will receive a fair, dispassionate, and reasoned response after appropriate analysis.

Very truly yours,

Jeffrey B. Rudman

JBR/dk

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Beijing    Berlin    Boston    Brussels    Frankfurt    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington

WILMERHALE

Craig W. Smith, Esq.
July 10, 2009
Page 2

cc:    Paul Engelmayer, Esq.

# Exhibit D

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

July 16, 2009

**VIA U.S. MAIL**

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

> **Re:    Shareholder Demand Letter**

Dear Jeff:

Thank you for your July 10 letter. We appreciate your client's commitment to review carefully the matters raised in our June 1, 2009 letter.

We must take issue, however, with your assertion that the "predicate" for Ms. Vancil's demand is that she demonstrate some sort of "entitlement" to make a demand. The only authority we are aware of that squarely addresses the issue expressly rejects this proposition. *See Schick v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235, 1241 (Del. Ch. 1987) ("[T]he 'entitlement' or not of one to make a demand under Rule 23.1 is, itself, irrelevant to a board's duty upon receiving such demand . . ."). We invite you to bring to our attention any cases that you believe support the special committee's position, and we ask that the committee reconsider its refusal to act unless Ms. Vancil demonstrates her standing to sue.

Further, much of the information the committee requests is unnecessary to demonstrate standing, let alone entitlement as a shareholder to make a demand on the Board of Directors. As I stated during our call, we are willing at this point to provide the committee with documentation sufficient to demonstrate that Ms. Vancil is an iStar Financial Inc. shareholder. That is more than is required under the law and should suffice.

*iStar Financial Inc.*
July 16, 2009
Page 2

Finally, I note that your letter does not provide the information requested in my June 26 letter to Mr. Dugan. I understand that you were only recently retained by the committee. We would appreciate a response to our requests once you have had sufficient opportunity to familiarize yourself with the issues raised in Ms. Vancil's demand and the committee's plans to address them.

On an administrative note, effective August 1, 2009, the law firm of Robins Umeda LLP will change its address from 610 West Ash Street, Suite 1800, San Diego, CA 92101 to:

600 B Street, Suite 1900
San Diego, CA 92101

The telephone and facsimile numbers and email and website addresses will remain the same. Please revise your records accordingly.

Thank you very much for your anticipated cooperation.

Very truly yours,

CRAIG W. SMITH

CWS/sem

417721

# Exhibit E

WILMERHALE

Jeffrey B. Rudman

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

*VIA EMAIL and FEDERAL EXPRESS*

July 22, 2009

Craig W. Smith, Esq.
Robbins Umeda LLP

610 West Ash Street, Suite 1800
San Diego, CA  92101

      Re:    Shareholder Demand Letter

Dear Craig:

This will acknowledge your letter of July 16, 2009.  It seems to me a little disingenuous.  Are you really threatening a derivative suit in the absence of having a plaintiff who owns iStar shares?

To amplify on my concern, when we spoke on the telephone on July 9, 2009, I asked you if Ms. Vancil owned shares.  You did not, as you say to me in your July 16 letter, offer at that point to provide any documentation to me concerning her ownership; rather, you said that you personally did not have the facts concerning her holdings, that someone else in your office was attending to that, and that you would speak with that person.

Your words resonated with me because I had been in court opposite your firm on February 2, 2006 when Judge Tenille sitting in the Superior Court in Wake County, North Carolina asked a lawyer from Robbins Umeda and Fink, a Mr. Wedeking, how many shares of Red Hat common stock Mr. Wedeking's client, a Mr. Egelhof, owned.  Mr. Wedeking replied he did not know, because "[s]omeone else in our office handles shareholder relations."  (If Mr. Wedeking is still with you and if he has the transcript, you can verify this for yourself.)

It turned out that Mr. Egelhof did not have any shares: he had sold them sometime previously and your law firm either did not know that fact or otherwise failed to advise the Court of it.

Judge Tenille was not amused.  He wrote:

> This is a purported shareholder derivative action in which the
> failure of counsel to communicate with their client in violation of
> the Rules of Professional Conduct, the failure of the client to
> communicate with counsel in contravention of his fiduciary duties,
> the needless rush to file a complaint, the filing of defective
> pleadings, and the solicitation of a plaintiff unqualified to fulfill
> the significant duties of a plaintiff in a shareholder derivative
> action all converged to create a situation in which neither the firm
> nor the client fulfilled their duties and obligations.

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Beijing   Berlin   Boston   Brussels   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

WILMERHALE

Craig W. Smith, Esq.
July 22, 2009
Page 2

He went on to say:

> According to statements made by Mr. Wedeking and Mr. Fink in
> oral argument, the firm has a "shareholder relations department"
> which is evidently charged with communicating with clients who
> are serving as shareholder derivative or class action plaintiffs in
> lawsuits being handled by the firm. It is unclear if the shareholders
> relations department is populated by lawyers, legal assistants, or
> public relations personnel. It was clear from statements made by
> both Mr. Wedeking and Mr. Fink at oral argument that neither of
> them had ever met Mr. Egelhof nor knew anything about him. Mr.
> Wedeking did not know how many shares Mr. Egelhof owned, and
> Mr. Fink erroneously represented to the Court that he owned
> hundreds of shares.
>
> When Mr. Wedeking appeared in this Court and knew absolutely
> nothing about his client, the Court requested that he at least find
> out how many shares of Red Hat stock his client owned. That
> request obviously prompted some inquiry which produced the
> information that Mr. Egelhof was no longer a shareholder, a fact
> communicated to the Court and counsel by e-mail. When Mr. Fink
> appeared and argued the motion for sanctions, he did not know
> much more than Mr. Wedeking about the client. *His excuse was
> that Mr. Egelhof was originally Mr. Robbins's client.* The Court
> ordered that Mr. Egelhof's deposition be taken. That deposition
> produced the facts which are of concern to the Court. (emphasis
> supplied)

It is quite true that Judge Tenille did not award us sanctions in that case and his grant of
sanctions for violations of North Carolina Rules of Professional Conduct was later reversed. But
his description of your firm's behavior was entirely accurate in my view, was left undisturbed by
the appeals court, and was embraced by Judge Cote in *In Re JPMorgan Chase & Co.
Shareholder Derivative Litigation*, 2008 WL 4298588 (Sept. 19, 2008).

Turning to more recent events: on April 15, 2008, Citiline Holdings, Inc., represented by
Coughlin Stoia, filed suit against iStar, alleging in direct form the putative wrongdoings your
letter asserts in derivative form.

The very next day – April 16, and probably not by chance – your firm filed a derivative suit. It is
hard to ignore that a very prominent lawyer at Coughlin Stoia is Darren Robbins and that a
named partner in your firm is Brian Robbins. As you know, Darren and Brian are brothers and it
is, of course, possible that it occurred to Brian that the derivative suit he was filing might yield
far more expeditious discovery than the case his brother was filing, subject as his brother's case

WILMERHALE

Craig W. Smith, Esq.
July 22, 2009
Page 3


was, to the stays of discovery imposed by the Private Securities Litigation Reform Act. That
discovery might even assist Darren's firm in preparing the inevitable amended complaint.

Unhappily for your firm, it turned out that your firm's client in the derivative suit did not own
any shares of iStar.

So now you are back, this time making the demand that is the predicate for a derivative suit and
apparently you are back with an 85 year-old woman who lives in St. Louis.

On July 10, 2009 I sent you a short, simple letter asking for proof of her share ownership. The
letter had four enumerated items. They were:

1.      the full name, residential and, if applicable, business address of your alleged client, Ms.
Addie Vancil;

2.      brokerage statements, or the equivalent thereof, showing the name of the brokerage firm
through which she allegedly purchased iStar shares;

3.      the address of the brokerage firm office which oversaw and oversees her account;

4.      brokerage statements showing the date(s) of the purchase(s) of her shares, and a current
brokerage statement showing that she still owns these shares.

Would you kindly tell me which of those four items you find so onerous or difficult to comply
with? What *exactly* do you propose to produce which will demonstrate that she does own iStar
shares?

Permit me to be direct. I have considerable misgivings about the candor of your firm when it
comes to proffering plaintiffs who, in fact, own the shares your firm says they own. All I want
from you is enough information so that I can test Ms. Vancil's share ownership. Between the
Egelhof case and the Arnold case, you cannot deny my grounds for concern. And you, perhaps
better than I, could bring to my attention other cases which might stoke my concern.

Very truly yours.

Jeffrey B. Rudman

JBR/dk

# Exhibit F

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

July 23, 2009

**VIA E-MAIL and U.S. MAIL**
jeffrey.rudman@wilmerhale.com

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

> ### *Re: Shareholder Demand Letter*

Dear Jeff:

I decline to join in the unfortunate tone of your July 22, 2009 letter or to address each of its misstatements and irrelevancies. But I will join you in being direct.

If I may trust the statement in your letter's final paragraph that all you want from me is information demonstrating Ms. Vancil's share ownership, then it appears that no further discussion is required. That is what I offered to provide during our July 9 telephone conversation, and that is what we will provide.

Your July 10 letter misstated the law, and on that basis you sought more information than the committee is entitled to. Your July 22 letter does not dispute that Ms. Vancil need not demonstrate any "entitlement" to make a demand, and that the board's duty upon receiving her demand is independent of any demonstration of "entitlement."

You also misremember our July 9 telephone conversation. I did say that other members of our Firm were in direct communication with Ms. Vancil, but I did not say that I did not have the facts concerning Ms. Vancil's holdings. In fact, I told you that I understood that our Firm had recently confirmed Ms. Vancil's shareholdings, and that we were willing to provide you with documentation

*iStar Financial Inc.,*
July 23, 2009
Page 2

to that effect. You asked me to confirm additional personal information about Ms. Vancil, which I told you I was not in a position to provide.

Enclosed herewith, please find a true and correct copy of Ms. Vancil's July 13, 2007 account statement showing that she is indeed an iStar shareholder. Please confirm whether or not the committee will commence its work in connection with Ms. Vancil's demand.

Finally, I note that despite repeated requests, we have received none of the information requested in my June 26 letter to Mr. Dugan. Please let us know at your earliest convenience when we can expect to receive this information.

Very truly yours,

CRAIG W. SMITH

CWS/acm

Enclosure

cc:     Addie Vancil

Positions: Fidelity Investments

**Accounts & Trade > <u>Portfolio</u> >**
**Positions**

<u>Help/Glossary</u> | <u>Download</u> | <u>Print</u>

**Account** | ADDIE INDIVIDUAL - ▼ | <u>Name This Account</u>

Fields highlighted in yellow indicate today's prices and/or activity.

| **Current Values** | **Cost Basis** | **Closed Positions** | |
|---|---|---|---|

Positions: Fidelity Investments

**Show:** All Positions ▼

As of: 07/13/2009, 2:37 PM

| Symbol ▲ | Description | Quantity | Previous Price | Most Recent Price | Previous Value | Most Recent Value | Change Since Last Close $ | Change Since Last Close % |
|---|---|---|---|---|---|---|---|---|
| SFI | ISTAR FIN INC (Margin) | 1,000.000 | $2.29 | $2.34 | $2,290.00 | $2,340.00 | ↑$50.00 | ↑2.18% |

Total:

Today's Change

# Exhibit G

WILMERHALE

July 27, 2009

Jeffrey B. Rudman

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

*Via First Class Mail and Email*

Craig W. Smith, Esq.
Robbins Umeda LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

      Re:    Shareholder Demand

Dear Craig:

This will respond to your July 23, 2009 letter.

The next to last paragraph of it states as follows:

> Enclosed herewith, please find a true and correct copy of Ms. Vancil's
> July 13, *2007* account statement showing that she is indeed an iStar
> shareholder. Please confirm whether or not the committee will commence
> its work in connection with Ms. Vancil's demand. (emphasis supplied)

Attached to your letter is a deeply redacted, hard to decipher, document which possibly came
from Fidelity Investments, but is so redacted one scarcely knows what to make of it. That
document references a date of July 13, *2009*. (emphasis supplied). It does not reference *2007*
and it does not even squarely reference Ms. Vancil. The only "evidence" that this brokerage
statement refers to Ms. Vancil is (a) your paragraph quoted above, which gets the year wrong,
and (b) a separate page from Fidelity which says "Addie Individual" followed by an apparent
redaction.

Your letter also references my request for "additional personal information about Ms. Vancil."
The only information for which I have ever asked you in terms of Ms. Vancil is set forth in my
letter to you of July 10, 2009, which I attach for your convenience. I suppose that asking for
such things as Ms. Vancil's full name and residential address is personal information, but it is
hardly prying given that she wishes to be a representative plaintiff.

Putting to the side the fact that your letter references what I believe to be an erroneous date, or
that, in any event, the attachment offers a date two years later and that, in any event, the
attachment does not show that anybody named Addie Vancil owned any iStar stock, there is a
more profound difficulty. Your original demand dated June 1, 2009 suggests that during the
period from July 2, 2007 to March 6, 2008, certain of iStar's officers and directors did certain
unlawful things. You describe the July 2, 2007 to March 6, 2008 period as "the Relevant
Period." What exactly happened on those two dates is left to the reader's imagination.

WILMERHALE

Page 2

It is, I think, a fair reading of your letter that the "wrongs" began in July 2007 and possibly were over by March 2008. You do mention a class action suit filed in February 2009, but if that is the suit we have both been discussing, that suit was in fact filed in April 2008. Nothing in your letter indicates that the harms occurred for the first time on or about July 13, 2009 which is the date on the brokerage statement which suggests that "Addie Individual" – redaction owned iStar stock as of that date.

Even you do not pretend that you have offered me anything to show that Ms. Vancil owned shares during the "Relevant Period" unless you claim that the apparent typo from the above quoted paragraph in your July 23 letter constitutes that proof. Just to remind you of what you surely already know: to bring a derivative suit, one must have been a shareholder at the time of the wrongs of which one complains and one must own the shares continuously from that date through the duration of the lawsuit.

So let us get back to basics and please provide me with the information I asked of you in my letter to you of July 10, 2009. In the alternative, kindly tell me what is so onerous about the information I have asked of you.

Very truly yours,

Jeffrey B. Rudman

JBR/dk
Enclosure

cc:   Paul Engelmayer, Esq.

# Exhibit H

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

600 B STREET, SUITE 1900
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKH0FF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

August 7, 2009

**VIA E-MAIL and U.S. MAIL**
jeffrey.rudman@wilmerhale.com

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

Re: *Shareholder Demand Letter*

Dear Jeff:

Thank you for your July 27, 2009, letter. You are correct in noting that my July 23, 2009, letter contains a typographical error. The on-line account statement we provided to you is dated July 13, 2009. My apologies. The redactions to which you refer delete information concerning Ms. Vancil's positions other than her iStar Financial holdings and her account numbers. This information is not relevant. The information relating to Ms. Vancil's ownership of iStar Financial stock remains intact. It shows that Ms. Vancil owns 1000 shares of iStar Financial stock.

Ms. Vancil has made a demand on the board. She has not yet decided whether to commence litigation on behalf of iStar Financial. If the Board's response to Ms. Vancil's demand is not sufficient and she decides to file suit, we will gladly discuss the parties' discovery requests at that time.

Very truly yours,

CRAIG W. SMITH

CWS/acm

Enclosure

cc:   Addie Vancil

# Exhibit I

WILMERHALE

August 10, 2009

Via First Class Mail and Email

**Jeffrey B. Rudman**

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

Craig W. Smith, Esq.
Robbins Umeda LLP
600B Street, Suite 1900
San Diego, CA 92101

Dear Craig:

This will acknowledge your letter of August 7, 2009. Rather than continue our correspondence, why don't we just agree that you have done nothing to show me that Ms. Vancil owned any iStar shares at the time the alleged wrongs which you describe in your letter of June 1, 2009 occurred?

Very truly yours,

Jeffrey B. Rudman

JBR/dk

cc:    Paul Engelmayer, Esq.

# Exhibit J

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

600 B STREET, SUITE 1900
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

September 2, 2009

**VIA E-MAIL and U.S. MAIL**
jeffrey.rudman@wilmerhale.com

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

        *Re:    Shareholder Demand Letter*

Dear Jeff:

Thank you for your August 10, 2009 letter. We have cited controlling authority holding that a shareholder's declination to provide proof of standing to sue is not a proper basis for refusal to consider a shareholder's demand. We have asked you repeatedly to provide us with any contradictory authority of which you are aware. To date, you have ignored our request.

We ask once again that you confirm whether iStar Financial Inc.'s Board of Directors has, in fact, decided to refuse Ms. Vancil's demand on this basis. For your convenience, we have attached a hardcopy of Ms. Vancil's July 2009, account statement showing her holdings in iStar Financial.

Very truly yours,

CRAIG W. SMITH

DRF/klc

# Exhibit K

WILMERHALE

September 9, 2009

Jeffrey B. Rudman

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

VIA FIRST CLASS MAIL AND EMAIL

Craig W. Smith, Esq.
Robbins Umeda LLP
600 B Street, Suite 1900
San Diego, CA 92101

Dear Craig:

This will respond to your most recent letter dated September 2, 2009. Permit me to review the bidding thus far.

On June 1, 2009 you wrote that your firm had been retained to represent Addie Vancil. You complained of conduct occurring from July 2, 2007 to March 6, 2008. Thereafter, you made certain demands.

Neither you nor your client initially offered any proof of her iStar share ownership when we corresponded. After much hemming-and-hawing, on July 23, 2009 you provided a heavily redacted brokerage statement of some sort which you said showed Ms. Vancil owned 1,000 shares of iStar as of July 13, 2009, or, more than two years after the commencement of the relevant period and approximately 17 months after the close of the relevant period. Even you did not claim that Ms. Vancil owned shares during the July 2007 to March 2008 period. You did suggest she was contemplating litigation if iStar didn't respond "appropriately" to her demands.

In the course of our correspondence, I offered that, given the chronology, Ms. Vancil could not sue as she did not have standing. You ignored that point, but cited the *Schick* case which, in your most recent letter, you claim constitutes "controlling authority."

Without spending much time on the fact that *Schick* is a Delaware decision and that iStar is a Maryland REIT, the *Schick* case does indeed hold that anybody, including a "busybody," can send a demand letter to the corporation. It does not say that a busybody has standing to bring a derivative action.

The court observes that, in the nature of things, a Rule 23.1 demand serves a "notice function." *Schick at 1240.*

The iStar Board had notice of your client's "grievances" because they are embodied in the direct suit that Coughlin Stoia brought well before your letter arrived on or about June 1. iStar has engaged very competent counsel to address the Coughlin Stoia matter. "Notice" provided by you or Ms. Vancil is at best redundant.

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Beijing   Berlin   Boston   Brussels   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

WILMERHALE

Page 2

More critically, the decision says:

> *The board has no obligation to take any specific type of action to*
> *comply with a demand under Rule 23.1.*  The board may, for
> example, ignore the demand, or it may take other action it deems
> appropriate if, in the exercise of its good faith judgment the
> circumstances indicate that the corporation's interest would be
> served thereby. (emphasis supplied)

*Id.*

I have tried to read quite closely the most recent enclosure you sent me.  It appears to be a
Fidelity investment report for Ms. Vancil's account for the month of July 2009.  It seems to show
that, as of July 31, 2009, she owned 1,000 shares of iStar.  The document you previously sent me
seems to show that as of July 13, 2009, Ms. Vancil owned 1,000 shares of iStar.  Once again,
nothing shows me that she owned shares as of the July 2, 2007 to March 6, 2008 time frame.

Equally troubling is that nothing you have delivered to me thus far shows that she owned shares
as of June 1, 2009, the day you wrote: "[o]ur Firm has been retained to represent Addie Vancil, a
*shareholder* of iStar Financial, Inc., ("iStar" or the "Company"), in connection with breaches of
fiduciary duty by members of iStar's Board of Directors (the "Board") and certain of the
Company's current and former executive officers."  (emphasis supplied)

Could I politely suggest that our correspondence now come to an end?  The law is clear: to be an
appropriate derivative plaintiff, that plaintiff needs to demonstrate continuous share ownership,
meaning ownership at the time of the wrongs alleged, ownership at the time of demand, at the
time of the filing of the derivative suit, and for the duration of the suit.  Despite every
opportunity, you have repeatedly declined to demonstrate your client's continuous ownership of
iStar shares.

Very truly yours,

Jeffrey B. Rudman

JBR/dk

# Exhibit L

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

600 B Street, Suite 1900
San Diego, California 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

November 6, 2009

**VIA E-MAIL AND U.S. MAIL**
jeffrey.rudman@wilmerhale.com

Jeffrey Rudman
WILMER HALE LLP
60 State Street
Boston, MA 02109

     Re:    *Shareholder Demand Letter*

Dear Jeff:

I write in response to your letter dated September 9, 2009. Your letter contains quite a bit of argument and characterization, and yet another round of backhanded *ad hominem*, which we will continue to ignore. What is missing is a clear and plain statement of iStar Financial, Inc.'s ("iStar") Board of Directors' position with respect to Ms. Vancil's demand.

Is it the Board's position that it will not investigate and substantively respond to the issues raised in Ms. Vancil's demand unless and until she proves to your satisfaction that she owned iStar Financial shares at the time of the alleged wrongdoing and has owned iStar shares continuously since then? This is a simple question to which we would appreciate a clear and direct answer. If there is some other basis for what appears to be a decision by the Board to refuse Ms. Vancil's demand without an investigation and report, please provide a clear and complete statement of those grounds.

We seek this clarification in order to avoid potentially costly misunderstandings. For example, you have assumed from our disagreement about whether Ms. Vancil must demonstrate her standing to sue before the Board would be obligated to investigate her demand that Ms. Vancil does not have standing to sue. You should make no such assumption. Ms. Vancil has standing to sue.

Regardless, Ms. Vancil's standing to sue has no bearing on the Board's duties in responding to her demand. We have been over this ground before, but your position with respect to the legal basis for the Board's insistence that Ms. Vancil prove that she has standing to sue has changed. Your most recent letter suggests that we discontinue our correspondence because Ms. Vancil has not proven that she would have standing to sue, but you concede, as you must, that under Delaware law, "the 'entitlement' or not of one to make a demand under Rule 23.1 is, itself, irrelevant to a board's duty upon receiving such a demand ... ." *Schick,* 533 A.2d at 1240-41 ("What is *not* a relevant characteristic of information in this setting is whether the source of it is 'entitled' to force it upon the board.") (Emphasis in original). Your argument now seems to be that Delaware law is not controlling as to a Maryland REIT. I do not need to tell you that, with the notable exception of the Maryland Supreme Court's decision regarding the standard for pleading demand futility (*Webowsky v. Collumb,* 766 A.2d 123 (Md. 2001)), Maryland courts generally follow Delaware corporate law on questions as to which Maryland appellate courts have not had occasion to rule.

Your current letter cites no contrary authority from Maryland or any other jurisdiction. Indeed, a review of the bidding, as you put it, shows that you have never cited any authority to support your insistence that we must prove Ms. Vancil's standing to trigger the Board's obligation to investigate reasonably and in good faith the issues identified in her demand. Instead, your September 9 letter makes a new argument: That iStar's Board had notice of Ms. Vancil's "grievances" from the shareholders' securities fraud class action, *Citiline Holdings, Inc. v iStar Financial Inc., et al.,* Case No. 1:08-cv-03512-RWS (S.D.N.Y. filed Feb. 2, 2009), and "iStar has engaged very competent counsel to address" the class action.

As to your new argument, Maryland and Delaware law are clear and consistent concerning a board's duty to investigate upon receiving a shareholder demand. *See, e.g., Bender v. Schwartz,* 917 A.2d 142, 152 (Md. App. 2007) ("Once a demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation."). Suffice it to say, the engagement of counsel to defend iStar and the individual officers and directors named defendants in the securities class action hardly qualifies as evidence that the Board has addressed independently, reasonably, and in good faith the issues raised by Ms. Vancil's demand. By her demand, Ms. Vancil seeks, among other things, to hold certain iStar fiduciaries responsible for exposing iStar to liability for securities fraud, including the very corporate fiduciaries that defense counsel in the securities class action represent. Absent a far more detailed explanation of just how class action defense counsel have assisted the Board in addressing the issues raised in Ms. Vancil's demand and of what exactly the Board has done to address the wrongdoing alleged therein, we will have no choice but to treat your correspondence as a peremptory refusal of Ms. Vancil's demand.

In assessing whether the Board's response falls within the ambit of the business judgment rule, it will be important to know whether the Board has refused the demand based on: (1) an unfounded factual assumption that she does not have standing; (2) a unfounded legal position that the Board may refuse the litigation demands of shareholders who do not first prove to the satisfaction of the Board that they would have standing to sue; and/or (3) the (undisclosed and unexplained) work of defense

*Shareholder Demand Letter*
November 6, 2009
Page 3

defense counsel in a related securities class action who represent the corporate fiduciaries who are among the targets of the litigation demand.

We look forward to your response to these important questions.

Very truly yours,

CRAIG W. SMITH

433478

# Exhibit M

WILMERHALE

**Jeffrey B. Rudman**

November 23, 2009

+1 617 526 6912 (t)
+1 617 526 5000 (f)
jeffrey.rudman@wilmerhale.com

*VIA FIRST CLASS MAIL AND EMAIL*

Craig W. Smith
Robbins Umeda LLP
600 B Street, Suite 1900
San Diego, California 92101

Re:    iStar Demand Letter

Dear Craig:

We are in receipt of your letter dated November 6, 2009.

We are, regrettably, at an impasse. Despite repeated requests, you still will not provide proof of your client's continuous ownership of iStar stock, which you do not dispute is the prerequisite for bringing a shareholder derivative suit. Without providing any proof, or even any explanation, you assure me in your letter that your client, Ms. Vancil, has standing to sue. Lewis Carroll notwithstanding, the fact that you have told me this thrice does not make it true. *See* Lewis Carroll, *The Hunting of the Snark* 3 (1876) ("I have said it thrice: What I tell you three times is true."). iStar cannot responsibly take your representations on faith when an issue as crucial as whether your client has standing to sue *on behalf of the company* is at stake.

You rely on the Delaware Chancery Court's decision in *Schick Incorporated v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235 (Del. Ch. 1987), to support your contention that the iStar Board of Directors is obligated to investigate Ms. Vancil's demand, despite your unwillingness to provide proof that she would have standing to sue on the company's behalf for the alleged wrongs identified in your letters of June 1 and June 15, 2009. Indeed, you rightly observe that the opinion permits anyone—"a stockholder, a supplier or customer or even a busybody"—to make a demand on a company's board of directors. *Id.* at 1241. But the opinion also states quite clearly that a demand

> is really a form of notice designed to afford the corporation's board
> of directors an opportunity to consider the facts asserted and to
> exercise its business judgment whether to press any arguable claim
> the corporation may possess or to take other action. *The board has
> no obligation to take any specific type of action to comply with a
> demand under Rule 23.1. The board may, for example, ignore the
> demand, or it may take other action it deems appropriate if, in the*

WILMERHALE

November 23, 2009
Page 2

> *exercise of its good faith judgment the circumstances indicate that*
> *the corporation's interests would be served thereby.*

*Id.* at 1240 (emphasis added).

Ms. Vancil's demand and all subsequent correspondence from your law firm have been received and carefully considered by a Special Committee of iStar's Board of Directors. Please know that, in reviewing this letter and the attendant correspondence, the Committee has been very mindful of its duties. However, with Ms. Vancil having studiously refused to demonstrate her standing, the Committee has no obligation to share with her what actions, if any, have been taken in response to her demand. You have repeatedly refused to provide even the barest minimum of information that would establish your client's standing to represent the company's interests in a derivative action. In light of your intransigence on this issue of fundamental importance to the company, iStar need not provide any response other than the one it has now given you no fewer than three times.

Best regards,

Jeffrey B. Rudman

## VERIFICATION

I, M. Lee Arnold, as agent and attorney-in-fact for Plaintiff Addie Lee Vancil, hereby declare as follows:

Addie Lee Vancil is a shareholder of iStar Financial, Inc. She has held shares of iStar Financial, Inc., stock continuously from the time of the wrongdoing complained of and remains a shareholder. Ms. Vancil has retained competent counsel. Pursuant to Ms. Vancil's instructions and the authority vested in me as her agent and attorney-in-fact, I am ready, willing, and able to pursue this action vigorously on behalf of iStar Financial, Inc. I have read the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

Signed and Accepted:

Dated: _27 May 2010_

_____
M. LEE ARNOLD, agent for ADDIE LEE VANCIL